**Johnny Mack WESTBROOK, Petitioner,**

v.

**Walter B. ZANT, Warden, Georgia Diagnostic and Classification Center, Respondent.**

No. 81–7836.

United States Court of Appeals, Eleventh Circuit.

May 16, 1983.

Garland, Nuckolls & Catts, Steven H. Sadow, Joseph M. Nursey, Atlanta, Ga., for petitioner.

William Davis Hewitt, Asst. Atty. Gen., Atlanta, Ga., for respondent.

Before KRAVITCH, HATCHETT and CLARK, Circuit Judges.

HATCHETT, Circuit Judge:

State prisoner Johnny Mack Westbrook instituted this habeas corpus action by filing a petition containing both exhausted and unexhausted claims. Without holding an evidentiary hearing, the district court found all claims meritless and denied relief. We hold that the state's waiver of the exhaustion requirement of 28 U.S.C.A. § 2254(b) permits us to address the merits of Westbrook's unexhausted claims. The need for evidentiary proof as to underlying facts on an important issue, however, requires that we remand this case to the district court. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I. *Procedural History*[1]

On September 23, 1977, a Jones County, Georgia grand jury indicted Westbrook and Eddie William Finney on two counts of murder and two counts of kidnapping with bodily injury. In separate trials in the Jones County Superior Court, a jury found Westbrook guilty of all four charges and recommended that he receive the death penalty. The trial court sentenced Westbrook to death for each conviction on the murder counts, and to consecutive life sentences for each conviction on the kidnapping charges. On appeal and mandatory death sentence review, the Supreme Court of Georgia affirmed the convictions and sentences. *Westbrook v. State,* 242 Ga. 151, 249 S.E.2d 524 (1978).[2] The United States Supreme Court denied certiorari. *Westbrook v. Georgia,* 439 U.S. 1102, 99 S.Ct. 881, 59 L.Ed.2d 63 (1979).

Westbrook subsequently petitioned the Superior Court of Tattnall County, Georgia, for a writ of habeas corpus. Following an evidentiary hearing, that court denied Westbrook's petition. From this adverse decision, Westbrook applied to the Georgia Supreme Court for a certificate of probable cause to appeal the denial of his state petition for post-conviction relief. The Georgia Supreme Court denied the application, and again, the United States Supreme Court denied Westbrook's petition for a writ of certiorari. *Westbrook v. Balkcom,* 449 U.S. 999, 101 S.Ct. 541, 66 L.Ed.2d 297, *rehearing denied* 449 U.S. 1103, 101 S.Ct. 902, 66 L.Ed.2d 831 (1980).[3]

Pursuant to 28 U.S.C.A. § 2254, Westbrook sought collateral relief in the United

1. The facts of this case are adequately set forth in the published opinion of the Georgia Supreme Court, *Westbrook v. State,* 242 Ga. 151, 249 S.E.2d 524 (1978). We shall discuss only those facts that are relevant to the specific issues raised in this appeal.

2. Georgia's capital sentencing procedure requires the Georgia Supreme Court to review all death sentences. Ga.Code Ann. § 17–10–35.

3. Four United States Supreme Court Justices dissented to the denial of Westbrook's certiora-

ri petition for review of the denial of his application for habeas corpus relief in the Georgia state courts. Justices Stewart and White dissented in the belief that the case should be remanded in light of *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). Justices Brennan and Marshall dissented by adhering to their consistent view that the death penalty is in all circumstances cruel and unusual punishment prohibited by the eighth and fourteenth amendments. *See* section III.D of this opinion for discussion of the *Godfrey* issue.

States District Court for the Middle District of Georgia on February 2, 1981. On that date, the district court ordered Westbrook's execution stayed pending final resolution of his petition in the courts of the United States. Finding none of the circumstances set out in 28 U.S.C.A. § 2254(d)(1)–(8) present in the allegations of Westbrook's federal petition, the district court denied Westbrook's requests for an evidentiary hearing on May 22, 1981, and on June 11, 1981, issued an order denying Westbrook habeas corpus relief. On June 15, 1981, the district court denied Westbrook's subsequent motion to present evidence by deposition. Finding that further appeal would be legally frivolous, the district court denied Westbrook's application for a certificate of probable cause authorizing appeal as an indigent pursuant to 28 U.S.C.A. § 2253. *Westbrook v. Zant,* 518 F.Supp. 1262 (M.D. Ga.1981). This court granted Westbrook's application authorizing this appeal.

## II. *Issues on Appeal*

On appeal, Westbrook asserts six grounds for relief from his convictions and death sentences. He contends (1) that the state trial court abused its discretion in refusing to provide funds for a psychologist or psychiatrist to assist in presenting mitigating circumstances in the sentencing phase of trial, and that such refusal violated Westbrook's constitutional rights to due process, equal protection, and fundamental fairness; (2) that he was deprived of the effective assistance of counsel at his state trial because of his attorney's conflicting interest in the representation of Jones County in another case involving challenges to the county's selection procedures for grand and traverse juries prior to, and during the time of Westbrook's indictment and trial; (3) that the state trial court's capital sentencing instructions to the jury were constitutionally inadequate; (4) that the death sentences were based in part upon an unconstitutional application of the aggravating circumstance in the Georgia death penalty statute, Ga.Code Ann. § 17–10–30(b)(7); (5) that the state trial court erroneously admitted the confession of his co-indictee into evidence; and (6) that the district court erred in refusing to allow the presentation of evidence either through an evidentiary hearing or by deposition.[4] We reject Westbrook's arguments with respect to issues 1, 4, and 5. We find the state trial court's capital sentencing instructions constitutionally inadequate, however, and, therefore, Westbrook's death sentences must be vacated. As more fully explained in section III. B of this opinion, the lack of evidentiary proof precludes us from entering a dispositive ruling on the allegation of ineffective assistance of counsel.

Before discussing these contentions, we must first address a troublesome issue concerning claims raised for the first time in Westbrook's federal habeas corpus petition. Although it is apparent from the record that Westbrook's federal petition contains both exhausted and unexhausted claims, neither party has specifically briefed or argued the question of exhaustion in this court. The following contentions were not raised on direct appeal or in Westbrook's state habeas corpus petition and thus have not been exhausted in the state courts: the ineffective assistance of counsel argument based on a conflict of interest theory,[5] the

---

**4.** Westbrook also raises a seventh issue but has chosen not to address it in brief or at oral argument. He contends that his death sentences violate the sixth amendment and the due process and equal protection clauses of the fourteenth amendment to the United States Constitution because the Georgia statutory provisions and practices governing appellate review of death sentences are defective. This contention was answered adversely in *Smith v. Balkcom,* 660 F.2d 573 (5th Cir.1981), *modified on pet. for rehearing,* 671 F.2d 858 (1982), *mandate temporarily recalled,* 677 F.2d 20 (1982).

Westbrook apparently seeks to preserve this argument in the event that certiorari is granted in *Smith v. Balkcom.* We shall not address the merits of this contention.

**5.** In his state habeas corpus petition, Westbrook challenged the effectiveness of the assistance rendered by his counsel during the pre-trial portion of his case and throughout the trial and initial appeal to the Georgia Supreme Court. He further asserted that the underrepresentation of certain classes in the grand and traverse jury pools in Jones County violated his right to equal protection under the fourteenth

argument regarding allegedly unconstitutional sentencing phase jury instructions,[6]

the allegations concerning unconstitutional application of a statutory aggravating cir-

amendment. At the conclusion of this assertion, the state petition alleges that trial counsel's failure to raise a jury challenge at trial was due to his ineffective assistance. No mention is made of Westbrook's counsel's representation of Jones County. Arguably, the jury challenge allegation in the state habeas corpus petition can be interpreted as sufficiently raising the ineffective assistance argument regarding a conflict of interest. We seriously doubt, however, that this constitutes exhaustion of state remedies as required by 28 U.S.C.A. § 2254(b) because "the state court system [was not] apprised of the facts and the legal theory upon which the petitioner bases his assertion." *Galtieri v. Wainwright,* 582 F.2d 348, 353 (5th Cir.1978) (en banc); *see also Hopkins v. Jarvis,* 648 F.2d 981, 983 n. 2 (5th Cir.1981).

**6.** Westbrook's federal petition attacks five specific areas of the state trial court's sentencing instructions. The petition alleges that the court (1) failed to define statutory aggravating circumstances; (2) failed to define and describe the nature and function of mitigating circumstances; (3) informed the jury that it was not required to consider mitigating circumstances; (4) failed to explain the relationship between aggravating and mitigating circumstances; and (5) failed to explain that the jury could recommend a life sentence although aggravating circumstances were found. When asked if there were any objections to the charge, Westbrook's counsel excepted to the charge on grounds not raised here. On direct appeal in the Georgia Supreme Court, Westbrook enumerated as error only the fifth challenge listed above—failure to explain that a life sentence could be imposed although aggravating circumstances were found. Failing to mention that Westbrook had not objected to the instructions on this ground at trial, the Georgia Supreme Court addressed this enumeration on the merits and ruled against him. *Westbrook v. State,* 242 Ga. 151, 156–57, 249 S.E.2d 524, 528–29.

When a state prisoner fails to comply with an established state contemporaneous objection rule without demonstrating both cause for noncompliance and actual prejudice, consideration of the issue is barred in federal habeas corpus proceedings. *Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *Ford v. Strickland,* 696 F.2d 804 at 816–17 (11th Cir.1983) (en banc). It would appear that Westbrook's failure to object to the charge at trial precludes this court from entertaining his arguments on the merits, absent a showing of cause and prejudice. *See Engle v. Isaac,* 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). At the time of Westbrook's trial, however, the law in Georgia did not require criminal defendants to object to perceived error in jury instructions in order to raise error on appeal, even where defense counsel tells the

trial judge that he has no objections to the charge. *Sims v. State,* 234 Ga. 177, 214 S.E.2d 902 (1975). Georgia Code Ann. § 5–5–24(a) states that "no party may complain of the giving or the failure to give an instruction to the jury, unless he objects thereto before the jury returns its verdict . . . ." As originally enacted, this provision applied to all cases. In 1968, the statute was amended to provide that it "shall not apply in criminal cases." Ga.L.1968, pp. 1072, 1078. The Georgia Supreme Court recognized certain instances where a criminal defendant could forfeit the right to challenge on appeal an unobjected to jury charge. *See, e.g., State v. Stonaker,* 236 Ga. 1, 222 S.E.2d 354 (1976) (failure to charge on lesser included offense); *Hill v. State,* 237 Ga. 523, 228 S.E.2d 898 (1976) (induced error doctrine). Those exceptions are not applicable here.

In 1979, the Georgia Supreme Court announced in *White v. State,* 243 Ga. 250, 253 S.E.2d 694 (1979), that a criminal defendant waives the right to enumerate error on appeal by failing to respond to the trial court's inquiry on objections. 243 Ga. 250, 252, 253 S.E.2d 694, 696 (overruling *Sims v. State,* 234 Ga. 177, 214 S.E.2d 902 (1975)). In *Jackson v. State,* 246 Ga. 459, 271 S.E.2d 855 (1980), the court explained that in order to avoid waiver when the trial court inquires if there are objections to the charge, "counsel must state his objections or follow the procedures set forth in *Gaither v. State,* 234 Ga. 465, 216 S.E.2d 324 (1975), and approved in *White* of reserving the right to object on motion for a new trial or on appeal." 246 Ga. at 460, 271 S.E.2d at 856–57. *See also Rivers v. State,* 250 Ga. 303, 298 S.E.2d 1, 7 (1982).

Thus, at the time of Westbrook's trial, Georgia did not have an established procedure requiring criminal defendants to object at trial in order to assign error to jury instructions and have the error addressed on appeal. Therefore, we find *Wainwright v. Sykes* inapplicable to this particular aspect of Westbrook's challenge to the sentencing phase instructions. Because Westbrook raised this particular challenge on direct appeal, he has exhausted available state remedies. *Pulliam v. Balkcom,* 245 Ga. 99, 263 S.E.2d 123, *cert. denied,* 447 U.S. 927, 100 S.Ct. 3023, 65 L.Ed.2d 1121 (1980); *Brown v. Ricketts,* 233 Ga. 809, 213 S.E.2d 672 (1975). Moreover, because the Georgia Supreme Court addressed the merits of this challenge, we must also determine the merits of the claim. *Lefkowitz v. Newsome,* 420 U.S. 283, 292 n. 9, 95 S.Ct. 886, 891 n. 9, 43 L.Ed.2d 196 (1975); *Machetti v. Linahan,* 679 F.2d 236, 238 n. 4 (11th Cir.1982).

The remainder of Westbrook's challenges to the sentencing instructions present potential problems with waiver due to the fact that they were not raised on direct appeal or in the state

cumstance to support the death sentence, and the contention regarding improper admission of the confession of Westbrook's co-indictee. In its answer to Westbrook's federal petition, the state advised that recourse to the state courts would be futile in that any petition filed in the superior courts

habeas corpus petition. The arguments supporting these challenges stem from the holdings in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Spivey v. Zant,* 661 F.2d 464 (5th Cir.1981); and *Chenault v. Stynchcombe,* 581 F.2d 444 (5th Cir.1978); all of which were decided after Westbrook's trial in 1977. *Lockett* held that "the sentencer ... [must] not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original). *Spivey* and *Chenault* interpreted *Lockett* to require clear instructions on mitigating circumstances and the option to recommend against death. *See Spivey,* 661 F.2d 464, 470; *Chenault,* 581 F.2d 444, 448. In another habeas corpus case, the Georgia Supreme Court confronted a situation similar to that involved here, that is, challenges to jury instructions unobjected to at trial nor on appeal. The court's disposition convinces us that Westbrook's challenges are not waived. In *Holloway v. McElroy,* 241 Ga. 400, 245 S.E.2d 658 (1978), the Georgia Supreme Court granted the petitioner's application to review a denial of his state habeas corpus petition in order to consider allegations of burden-shifting jury instructions. The charge attacked in state habeas corpus was neither objected to at trial nor enumerated as error on appeal. Two issues required resolution; one procedural, the other substantive. The Georgia Supreme Court framed the issues this way: "(1) Has the question been waived by the failure to raise it on direct appeal, and (2) if not, did the charge place an unconstitutional burden of proof on the defendant?" 241 Ga. at 401, 245 S.E.2d at 659. The court disposed of the procedural issue in this fashion:

The state urges that since *Holloway* did not raise the burden-shifting issue on his appeal, he has waived the right to raise it in habeas corpus. *See, e.g., Shoemake v. Whitlock,* 226 Ga. 771, 177 S.E.2d 677 (1970). However, Holloway's trial occurred on May 1, 1975, prior to our decision in *State v. Moore,* 237 Ga. 269, 227 S.E.2d 241 (1976), where we held that this court in the future would not approve burden-shifting charges. Holloway's trial was also prior to *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), which the Supreme

of Georgia will be dismissed as successive. In its brief in support of its answer, the state addressed the merits of the allegations regarding improper sentencing phase instructions and unconstitutional application of the statutory aggravating circumstance. On the conflict of interest-ineffective assist-

Court, in *Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977), held was fully retroactive. Since the issue involves law developed after Holloway's trial, we do not consider the issue waived and reach its merits. *See generally, Parrish v. Hopper,* 238 Ga. 468, 233 S.E.2d 161 (1977) (Hall, J., concurring specially). 241 Ga. at 401, 245 S.E.2d at 659 (footnotes omitted). *See also, Stephens v. Hopper,* 241 Ga. 596, 602, 247 S.E.2d 92, 96 (1978) ("We conclude that in a death case the sentencing charge is so crucial to the outcome of the trial that we will exercise our power to review those charges when the issue is placed before us on habeas, whether objection was made in the trial court or not.").

Because Westbrook's challenges to the jury instructions involved law developed after his state trial, we see no reason why the Georgia Supreme Court would decide the waiver question any differently in the instant case. The rationale of the former Fifth Circuit in *Holloway v. McElroy,* 632 F.2d 605 (5th Cir.1980), applies equally here:

[T]here is no question but that Holloway is entitled to raise as grounds for habeas relief the asserted errors in the trial court's charge, despite his failure to raise those issues at trial or pursue them on direct appeal. Any doubt that we might otherwise have as to whether Holloway was barred by a state-law contemporaneous objection rule or some other independent and adequate state-law procedural ground, *see Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), has been resolved for us by the highest authority on Georgia's procedural law, the Georgia Supreme Court. That court specifically held as a predicate to affirming the denial of Holloway's state-court habeas petition that, in view of the rapid changes in the law wrought by the United States Supreme Court since Holloway's trial in 1975, no state procedural ground should be used to bar Holloway from asserting his arguments on the merits of the trial court's charge. *Holloway v. McElroy,* 241 Ga. 400(1), 245 S.E.2d 658, 659 (1978).

632 F.2d at 617 (footnote omitted). We will therefore consider Westbrook's remaining challenges as presenting, as an initial hurdle, a question of exhaustion of state remedies, not as waived.

ance theory and the improper admission of confession argument, the state alleged that Westbrook had deliberately bypassed state remedies by failing to raise these arguments in his state petition. If not considered deliberately bypassed, the state argued that these claims were, in any event, without merit.[7]

In the order denying habeas corpus relief, the district court termed the state's suggestion of deliberate bypass "a valid observation." The order goes on to state, however, that the court reviewed the entire record and every asserted constitutional defect, but could find no grounds warranting habeas corpus relief. In its brief on appeal, the state addresses the merits of those issues cited above and not raised in the state courts. Moreover, at oral argument, the state specifically informed us that for purposes of this appeal, it waives the exhaustion requirement of 28 U.S.C.A. § 2254(b).

In *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), the Supreme Court held that under 28 U.S.C.A. § 2254(b) and (c), a federal district court must dismiss a habeas corpus petition containing any claims that have not been exhausted in the state courts. Dismissal leaves the petitioner with the option of returning to state court to exhaust those claims not previously raised or resubmitting a federal habeas corpus petition containing only exhausted claims. Recognizing that "[t]he exhaustion doctrine [wa]s principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings," the Court opined that a total exhaustion rule would promote comity and would not unreasonably impair a petitioner's right to relief. 455 U.S. 509, 518, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379, 387. The Court explained that [r]ather than increasing the burden on federal courts, strict enforcement of the exhaustion requirement will encourage

habeas petitioners to exhaust all of their claims in state court and to present the federal court with a single habeas petition. To the extent that the exhaustion requirement reduces piecemeal litigation, both the courts and the prisoners should benefit for as a result the district court will be more likely to review all of the prisoner's claims in a single proceeding, thus providing for a more focused and thorough review.

455 U.S. at 520, 102 S.Ct. at 1204, 71 L.Ed.2d at 389.

In *Rose v. Lundy,* the Sixth Circuit had specifically rejected the state's argument that the district court should have dismissed the petition because it included both exhausted and unexhausted claims. The case before us is in contradistinction because the state has chosen not to argue exhaustion, but instead has addressed all of Westbrook's claims on their merits. *Rose v. Lundy* provides no instruction for the situation where the state fails to raise the lack of exhaustion. Moreover, this case does not fit within either of the exceptions to federal court abstinence described in *Galtieri v. Wainwright,* 582 F.2d 348 (5th Cir.1978) (en banc), a decision predating *Rose v. Lundy,* but reaching the same result. We are not, however, without guidance.

In *Lamb v. Jernigan,* 683 F.2d 1332 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1276, 75 L.Ed.2d 496 (1983), the petitioner failed to raise his claim on direct appeal or in collateral attacks in state court so as to exhaust state remedies. The state conceded in district court that recourse to the state courts would be futile and failed to raise lack of exhaustion on appeal. This court held that, where the state fails to raise exhaustion in the appellate court, even though raised in district court, it will be deemed to have waived exhaustion. *Lamb,* 683 F.2d 1332, 1335 n. 1; *see also Shaw v.*

---

7. The state speaks in terms of a "deliberate bypass." In *Fay v. Noia,* 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), the Supreme Court held that a state prisoner who knowingly and deliberately bypasses state procedures intentionally relinquishes known rights and can be

denied collateral relief on that basis. The record does not indicate that Westbrook's failure to raise these arguments in federal court was the result of a deliberate bypass within the meaning of *Fay v. Noia.* We choose to frame this issue as one of exhaustion.

*Boney,* 695 F.2d 528, 529 (11th Cir.1983); *Hopkins v. Jarvis,* 648 F.2d 981, 983 n. 2 (5th Cir.1981). The court then proceeded to address the merits of the petitioner's claims. We choose to do the same.[8] In our view, holding that a state may waive exhaustion does not run contrary to the policy considerations of federal-state comity underlying total exhaustion of all constitutional claims initially in the state courts.[9] When the state fails to assign error to the district court's ruling on unexhausted claims, addresses the merits of those claims in its brief, and waives exhaustion at oral argument as done here, it obviously seeks resolution on the merits. This procedure of addressing the merits of unexhausted claims when the state waives exhaustion finds support in *Galtieri v. Wainwright,* where, in describing the contrasting positions of a reviewing court from that of a district court, the court stated that "[o]nce a federal habeas court has reached the merits of a claim and the case is presented for appellate review, the policy considerations that dictate dismissal for want of exhaustion are no longer controlling, and the reviewing court must entertain the case on its merits." 582 F.2d at 356 n. 15. Westbrook reminds us that in denying relief on his federal petition, the district court reviewed the entire record and every asserted constitutional defect, but could find no grounds supporting the issuance of the writ. Thus, in those cases where the district court reaches the merits of an unexhausted claim in a mixed petition and appeal is taken from its dispositive order, *Galtieri* instructs the appellate court to review the decision of the district court. 582 F.2d 348, 362. Therefore, we shall address the merits of Westbrook's claims, both exhausted and unexhausted.

**8.** Exhaustion is not considered a jurisdictional prerequisite. *Morgan v. Wainwright,* 676 F.2d 476, 477 n. 1 (11th Cir.1982); *Washington v. Strickland,* 693 F.2d 1243, 1248 n. 7 (5th Cir. 1982) (Unit B en banc).

**9.** *Compare Felder v. Estelle,* 693 F.2d 549 (5th Cir.1982) (state can waive exhaustion; comity denotes respect for state courts rather than state attorneys general), *with Jackson v. Cupp,* 693 F.2d 867 (9th Cir.1982) (state cannot con-

## III. DISCUSSION

### A. *Request for Psychiatric Assistance*

Prior to his state trial, Westbrook's appointed counsel filed a document entitled "Plea in Bar." By this plea, counsel sought to bar Westbrook's prosecution or, in the alternative, prohibit the state from seeking the death penalty based on several factors. In 1951, at the age of fourteen, the Jackson County, Georgia Superior Court found Westbrook guilty on eleven counts of burglary and sentenced Westbrook to consecutive five to ten year terms, or a total of 55 to 110 years. As an indigent black teenager in the early 1950's, Westbrook was not represented by counsel. Nevertheless, this conviction sent Westbrook to the Georgia state penal system for the next twenty years.

At a hearing on this plea, Westbrook testified that his adolescent years in prison were marked by repeated acts of brutality and homosexuality at the hands of hardened criminals. The plea alleges that exposure to this type of atmosphere at an immature age destroyed Westbrook's mental development and his capacity to know right from wrong. Because of the state's conduct in placing Westbrook in such an environment, the plea contends that the state has forfeited its right to take Westbrook's life, because to do so would constitute cruel and unusual punishment in violation of the eighth and fourteenth amendments to the United States Constitution. Westbrook's counsel cited numerous instances of his client's misconduct in prison including two attempted escapes. The record indicates that Westbrook was paroled in August, 1971. Shortly thereafter, however, a parole violation sent Westbrook back to prison

cede exhaustion; policy considerations transcend desire of the litigants to proceed with case). We do not address the issue of whether a district court is bound by a state's waiver of exhaustion when the district court believes exhaustion would not be futile or evidentiary development would be aided by dismissing the federal petition until the state courts have been given an opportunity to entertain the petitioner's claims.

where he remained until paroled again in January, 1975.

With the filing of the Plea in Bar, Westbrook's counsel orally moved the state trial court to appoint, at state expense, an independent qualified psychologist or psychiatrist. The expert would determine the effects, if any, of Westbrook's incarceration in the state penal system since the age of fourteen on the development of his personality and his ability to conform to acceptable societal standards. Trial counsel apparently wanted to demonstrate as a mitigating circumstance that Westbrook had been so dehumanized and brutalized by incarceration in adult prisons that his ability to function properly in society was impaired at an early age. Counsel stressed that his request for psychological assistance was not for the purpose of determining Westbrook's sanity at the time of the offense or his competency to stand trial. Rather, such an examination would reveal Westbrook's inability to conform his behavior so as to commit the aggravating circumstances required to support a sentence of death.

The state trial court denied the request for an examination and evaluation for any purpose other than to determine whether Westbrook knew the difference between right and wrong at the time of the commission of the offense or whether he could aid counsel in the preparation of his defense. The trial court recalled that at arraignment, the court asked counsel whether an examination and evaluation of Westbrook at Central State Hospital would be necessary. Clarifying this earlier inquiry, the court explained that such an examination was not restricted to Central State Hospital, but that it would be granted only in response to a special plea of insanity or incompetency. The court further recalled that Westbrook's co-indictee's counsel indicated a desire for such an examination of

his client and the court sent him to Central State. Westbrook's counsel stated that when the subject of an evaluation came up at arraignment, he was convinced that Westbrook knew it was wrong to commit a murder and saw no need for an evaluation. Upon discovering that Westbrook had spent the greater portion of his years incarcerated, however, counsel envisioned the need to determine the effects of such incarceration. Nonetheless, beyond the discretionary power to order an examination based on first-hand observation of the defendant, the trial court could point to no authority authorizing the examination for the purpose cited by Westbrook's counsel.

■ We find support for Westbrook's argument in principle, and disagree with the state trial court's explanation that no authority exists which would require that Westbrook's request be granted. On the facts of this case, however, we cannot say that the denial of the request for psychiatric assistance deprived Westbrook of his constitutional right to present evidence in mitigation.[10] Therefore, although we disagree with the state and district court's reasoning, we do not reverse on this issue because we find the result proper in this case.

■ Unquestionably, a defendant in a capital murder trial must be allowed to proffer, and a jury permitted to consider, any evidence of mitigation submitted as a basis for a sentence less than death. *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). In *Lockett,* the Supreme Court concluded that:

[T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the de-

---

10. Representing an indigent client, Westbrook argues that his counsel was "forced" to obtain the services of an unlicensed, college professor from the Department of Psychology at Mercer University. This witness testified that he had never dealt with circumstances involving the criminal justice system and had never testified

before in a judicial proceeding. Moreover, he had never met or had the opportunity to interview Westbrook. At a sidebar prior to closing arguments in the sentencing phase, the trial court summarized that the witness was an expert only to the extent of having a Ph.D. in psychology.

fendant proffers as a basis for a sentence less than death.

438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original) (footnotes omitted). The plurality upholding the death penalty statute in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), emphasized that Georgia's sentencing procedures "focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant." 428 U.S. at 206, 96 S.Ct. at 2940. The plurality further emphasized the statute's provision permitting the jury "to consider any aggravating or mitigating circumstances ...." 428 U.S. at 206, 96 S.Ct. at 2941. See Ga.Code Ann. § 17–10–30(b).

The Supreme Court reiterated these safeguards in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), by invalidating a death sentence imposed without the consideration " 'of individualized ... mitigating factors ... required by the Eighth and Fourteenth Amendments in capital cases.' " 455 U.S. 104, 105, 102 S.Ct. 869, 871, 71 L.Ed.2d 1, 5 (*quoting Lockett,* 438 U.S. 586, 606, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973). In *Eddings,* the sixteen-year-old defendant presented substantial mitigating evidence of turbulent family history, beatings by a harsh father, and serious emotional disturbance. The state trial court found the defendant's youth to be a circumstance in mitigation but refused, as a matter of law, to consider the defendant's troubled upbringing and emotional disturbance in mitigation. The Supreme Court held that this refusal violated the rule announced in *Lockett* because the state trial court had limited its consideration of mitigating circumstances. The Court stated that "[j]ust as the state may not by statute preclude the sentencer from considering

any mitigating factor, neither may the sentencer, refuse to consider, *as a matter of law,* any relevant mitigating circumstance." *Eddings,* 455 U.S. 104, 113–15, 102 S.Ct. 869, 875, 71 L.Ed.2d 1, 10–11 (emphasis in original).[11]

In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), inmates incarcerated in North Carolina correctional facilities brought suit against state prison officials claiming a denial of their right to access to the courts by the state's failure to provide legal research facilities. Adhering to its earlier decision in *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971), that law libraries or alternate sources of legal knowledge are constitutionally mandated, the Supreme Court held that the fundamental right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing adequate libraries or adequate assistance from persons trained in the law.

We interpret *Lockett v. Ohio* and *Gregg v. Georgia* as vehicles for extending a capital defendant's *right* to present evidence in mitigation to the placing of an *affirmative duty* on the state to provide the funds necessary for production of the evidence. Permitting an indigent capital defendant to introduce mitigating evidence has little meaning if the funds necessary for compiling the evidence is unavailable. "[T]he cost of protecting a constitutional right cannot justify its total denial." *Bounds v. Smith,* 430 U.S. at 825, 97 S.Ct. at 1496. Thus, we read *Bounds v. Smith* to require the state to furnish the services of a psychologist or psychiatrist in those capital cases deemed appropriate by the state trial court.

---

11. *Eddings v. Oklahoma* supports Westbrook's view that a mental disturbance less than insanity is a valid mitigating circumstance. Similar to the Oklahoma death penalty statute under scrutiny in *Eddings,* Georgia's death statute fails to define mitigating circumstances. *See Eddings,* 455 U.S. 104, 107, 102 S.Ct. 869, 872, 71 L.Ed.2d 1, 6; Ga.Code Ann. § 17–10–30(b). Abiding by the rule announced in *Lockett v. Ohio,* the *Eddings* Court concluded that evi-

dence regarding a defendant's mental and emotional development is a relevant mitigating circumstance that the sentencer may not refuse to consider. 455 U.S. 104, 116, 102 S.Ct. 869, 877, 71 L.Ed.2d 1, 12. *See also Spivey v. State,* 241 Ga. 477, 481, 246 S.E.2d 288, 291 (1978) ("the conclusion is inescapable that the legislature meant to empower the jury to consider as mitigating anything they [sic] found to be mitigating, without limitation or definition").

Under the law of Georgia at the time of Westbrook's trial, and in the absence of a special plea of insanity, the granting of a request for the appointment of an expert was a matter of trial court discretion. *Lewis v. State,* 239 Ga. 732, 238 S.E.2d 892 (1977); *Patterson v. State,* 239 Ga. 409, 238 S.E.2d 2 (1977); *Holsey v. State,* 235 Ga. 270, 219 S.E.2d 374 (1975).[12] Accordingly, the trial court's ruling on such a request is tested by the abuse of discretion standard. Applying that standard in this case, we disagree with Westbrook's assertion that the denial of his request rendered the sentencing phase of his trial fundamentally unfair.

In *Barnard v. Henderson,* 514 F.2d 744 (5th Cir.1975), this circuit's predecessor held that "[f]undamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by approximate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion." 514 F.2d at 746. The factual situation presented in *Barnard,* however, is readily distinguishable from the circumstances of the instant case. In *Barnard,* the court granted a Louisiana prisoner's petition for a writ of habeas corpus because of the state's refusal to grant the prisoner's request to allow inspection of the murder weapon and bullet by a ballistics expert of his own choosing. The state trial court refused the request citing Louisiana pre-trial discovery procedures which limited discovery of evidence in the hands of the prosecution to a defendant's confessions and to narcotics. Although the state trial court acknowledged that *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), would require production of evidence favorable to the accused, the prisoner had failed to show that an examination of the murder weapon

and bullet would be favorable to him. The Fifth Circuit opined that due process could not "be sidestepped by such a facile distinction." *Barnard,* 514 F.2d at 746; *see also, White v. Maggio,* 556 F.2d 1352 (5th Cir. 1977).

Turning to the circumstances of this case, we note that Westbrook's alleged inability to conform his behavior to societal standards is not a critical piece of evidence determinative of his guilt or innocence of the offenses charged. The denial of Westbrook's request, as opposed to Barnard's, did not preclude the examination of any evidence. The history of Westbrook's long incarceration was effectively placed before the jury and court by counsel. The evidence for which Westbrook sought a psychologist could have been demonstrated by other methods. Friends, relatives, or neighbors could have been subpoenaed to testify as to the effects of Westbrook's incarceration. Westbrook himself could have taken the stand in the penalty phase of trial and introduced mitigating testimony. It is our opinion that the circumstances of this case provided an inappropriate setting for the appointment of psychological assistance. We find no abuse of discretion in the state trial court's denial of Westbrook's request in order to support his theory of mitigation.

### B. *Ineffective Assistance of Counsel*

Westbrook's federal habeas corpus petition alleges that he was denied the assistance of effective counsel as guaranteed by the sixth and fourteenth amendments to the United States Constitution. Westbrook initially alleges that the attorney appointed to represent him was also counsel to Jones County. According to Westbrook, the representation of Jones County created an impermissible conflict of interest because it was his duty to defend potential lawsuits challenging official actions of the county,

---

**12.** Apparently, this is still the law of Georgia. *See Whitaker v. State,* 246 Ga. 163, 269 S.E.2d 436 (1980). In federal court, the trial judge's duty is clear. Under 18 U.S.C.A. § 3006A(e) (the Criminal Justice Act), an indigent defendant may make an *ex parte* request for psychiatric assistance at government expense. While such a request does not of itself require the

appointment of experts, "[o]nce a § 3006(A)(e) request is made, however, the court must make 'appropriate inquiry' to determine whether the defendant needs such assistance and whether he is financially unable to obtain it." *Pedrero v. Wainwright,* 590 F.2d 1383, 1391 n. 7 (5th Cir.1979).

such as the constitutionality of the county jury commission's procedures in selecting the grand and traverse jury pools. Westbrook claims that such a situation occurred in *Gibson v. Jackson,* 443 F.Supp. 239 (M.D. Ga.1977), *rev'd on other grounds,* 578 F.2d 1045 (5th Cir.1978), *cert. denied,* 439 U.S. 1119, 99 S.Ct. 1028, 59 L.Ed.2d 79 (1979). *Gibson* presented as a tangential issue, the composition of the jury pools in Jones County. *Gibson* was in litigation in the Middle District of Georgia during the time of Westbrook's jury trial in Jones County. In *Gibson,* the district court found that the underrepresentation of blacks and females in the Jones County grand and traverse jury lists established a prima facie showing of unconstitutional jury composition. 443 F.Supp. at 245.[13] With his appointed attorney defending Jones County in the *Gibson v. Jackson* litigation, Westbrook contends that it is understandable why the composition of the grand and traverse jury pools were not challenged.

Westbrook's second allegation of ineffective assistance involves his counsel's performance during the sentencing phase of trial. After the state indicated that it would not present evidence in aggravation of the offenses, Westbrook's counsel introduced a descriptive report of Westbrook's record of incarceration prepared by the Georgia Department of Human Resources. According to Westbrook, it was only through the action of his counsel that the jury was exposed to his record of incarceration and prior offenses.

■■■ The sixth and fourteenth amendments guarantee state criminal defendants the right to counsel reasonably likely to render and rendering reasonably effective assistance. *Mylar v. Alabama,* 671 F.2d 1299, 1300 (11th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3079 (U.S. Aug. 10, 1982)

(No. 81–2240); *Herring v. Estelle,* 491 F.2d 125, 127 (5th Cir.1974) (*quoting MacKenna v. Ellis,* 280 F.2d 592, 599 (5th Cir.1960)), *adhered to in pertinent part on rehearing en banc,* 289 F.2d 928 (5th Cir.), *cert. denied,* 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78 (1961). The constitutional right is not a guarantee of errorless counsel nor representation judged ineffective only by the benefit of hindsight. *Young v. Zant,* 677 F.2d 792, 798 (11th Cir.1982); *Washington v. Watkins,* 655 F.2d 1346, 1355 (5th Cir.1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982). Application of the ineffective assistance standard involves "a determination of whether reasonably effective assistance was rendered based upon the *totality* of circumstances and the entire record." *Nelson v. Estelle,* 642 F.2d 903, 906 (5th Cir.1981) (emphasis in original). Whether a defendant has been denied effective assistance of counsel is a mixed question of fact and law. *Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980); *Baty v. Balkcom,* 661 F.2d 391, 399 n. 5 (5th Cir.1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). Our review of mixed questions of law and fact is much broader than the clearly erroneous standard applicable to factual findings of the district court. *Baty,* 661 F.2d 391, 394 n. 7. Therefore, we may substitute our own judgment for that of the district court. *Baker v. Metcalfe,* 633 F.2d 1198, 1201 (5th Cir.), *cert. denied,* 451 U.S. 974, 101 S.Ct. 2055, 68 L.Ed.2d 354 (1981).

■■■ Although a conflict of interest may cause counsel's representation to fall below the sixth amendment standard, not all conflicts are so egregious as to constitute a sixth amendment violation. *United States v. Freeman,* 619 F.2d 1112, 1122 (5th Cir.1980), *cert. denied,* 450 U.S. 910, 101

13. The district court found evidence showing a 1975 Jones County grand jury list composed of:

    (a) 87.6 percent males and 12.62 percent females, [sic] and

    (b) 17.71 percent blacks and 82.29 percent whites in a county that is:

    (a) 47.19 percent male and 52.81 percent female, and

    (b) 33.3 percent black and 66.7 percent white.

The court held this evidence presented a prima facie showing of unconstitutional jury composition. 443 F.Supp. 239, 245 (*citing Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 532 (1970); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1966)).

S.Ct. 1348, 67 L.Ed.2d 334 (1981); *United States v. Alvarez,* 580 F.2d 1251, 1255 (5th Cir.1978). In *Baty v. Balkcom,* the court summarized the nature of a reversible violation:

> For a conflict of interest to cause representation to fail Sixth Amendment standards, this Circuit requires that the conflict be actual, not speculative. An actual conflict exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing.

661 F.2d at 395. An actual conflict of interest is presumptively prejudicial to the defendant. *Baty,* 661 F.2d 391, 395. "[W]hen counsel is confronted with an actual conflict of interest, prejudice must be presumed, and except under the most extraordinary circumstances, the error cannot be considered harmless." *Baty,* 661 F.2d at 395 (*quoting Turnquest v. Wainwright,* 651 F.2d 331, 334 (5th Cir.1981). As *Baty* indicates, nothing in *Cuyler* requires proof that an actual conflict of interest adversely affect counsel's performance or impair his client's defense. 661 F.2d 391, 396. *See also, Holloway v. Arkansas,* 435 U.S. 475, 490, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978) ("The evil . . . is in what the advocate finds himself compelled to refrain from doing"). Once a petitioner shows that his trial counsel actively represented conflicting interests, he has established the constitutional predicate for an ineffective assistance claim. *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1718.

If Westbrook's allegations are indeed fact, his appointed attorney's simultaneous representation of Jones County in a lawsuit challenging the composition of the county's jury lists created an actual conflict of the type described in *Baty.* The particular lawsuit, *Gibson v. Jackson,* evolved long before Westbrook was indicted. Clearly, then, counsel would have had notice that such a challenge had been raised. The district court issued its ruling in *Gibson* on December 16, 1977, approximately six weeks after Westbrook's conviction. It seems to us that Westbrook's counsel would have been hard pressed to present a jury composition challenge prior to Westbrook's trial because such a challenge would have been directed against another client. A jury composition challenge, certainly a plausible and prima facie-worthy argument in light of *Gibson,* would have been the appropriate method to discover if Jones County had, by the time of Westbrook's indictment, improved its selection procedures to more accurately reflect county population figures. At the same time, such an argument would have unquestionably undermined Jones County's defense in *Gibson.* This is precisely the type of conflict that renders meaningless the sixth amendment guarantee to effective representation.

Because the conflict of interest theory was not presented to the state courts and no evidentiary hearing was held in the district court, no record exists to evaluate Westbrook's claims. We therefore remand to the district court with directions to hold an evidentiary hearing. *See, e.g., Roberts v. Wainwright,* 666 F.2d 517, 519 (11th Cir. 1982); *Clark v. Blackburn,* 619 F.2d 431, 433–34 (5th Cir.1980). The hearing should determine if Westbrook's appointed attorney represented Jones County's interests in the *Gibson v. Jackson* litigation. If so, the petition must be granted and Westbrook's convictions set aside. If not, this particular allegation warrants no habeas corpus relief.[14]

---

14. Ga.Code Ann. § 9–14–42(b) states in part that "[t]he right to object to the composition of the grand or trial jury will be deemed waived . . . unless the person challenging the sentence . . . satisfies the court that cause exists for his being allowed to pursue the objection after the conviction and sentence has otherwise become final." The conflict of interest, if it in fact existed, would appear to satisfy the statute's requirement of a demonstration of cause for failing to raise the challenge. We emphasize that the issue is not whether Westbrook would have prevailed on a jury challenge in 1977, but whether his attorney, in view of the alleged conflicting representations, could have raised the challenge without damaging the interests of another client. *See Baty,* 661 F.2d at 395.

Westbrook also cites as ineffective assistance the introduction of a descriptive report from the Georgia Department of Human Resources fully detailing Westbrook's criminal background. This report consisted of exhibits containing accusations, indictments, convictions, sentences, and reports of Westbrook's in-custody behavior at various institutions within the Georgia penal system. Westbrook contends, and the record supports his contention, that this information was submitted to the jury unedited, unexplained, and with no comprehensible connection to mitigate the acts for which he was convicted.

Trial counsel's affidavit forms part of the record of the state habeas corpus proceedings. In the affidavit, he described his reasons for introducing Westbrook's correctional record at the sentencing phase. Counsel explained that he wanted to describe for the jury an individual who was either incapable of committing the acts of aggravation set forth in the Georgia statute, or that if he were capable of committing the acts of aggravation, his prior and inhumane treatment by the state had resulted in the state's forfeiting its right to execute Westbrook. According to counsel, Westbrook's correctional record was the most dramatic way to show what had occurred during his adult life. Counsel also noted that if he had not put the prior custodial record into evidence, he could not have argued that the trial court should have appointed a psychologist to analyze and explain the destructive and inhumane circumstances of Westbrook's lengthy incarceration.

■ On the basis of this affidavit, the state habeas corpus court found that counsel's purposes in introducing the report were "to enable [him] to appeal the trial court's denial of the appointment of a psychiatrist or psychologist and to show to the jury some mitigating circumstances in this sentence deliberation." In this appeal, Westbrook argues that under Georgia law, trial counsel could have preserved the denial of psychological assistance issue by simply making a proffer outside the presence of the jury. By introducing the report without directing the jury to consider its contents as mitigating evidence, Westbrook contends trial counsel did more harm than if he had introduced no evidence at all. Westbrook's observation is arguably valid. We do not agree, however, that trial counsel's actions during the sentencing phase fell below the standard of reasonably effective assistance. The purpose in introducing Westbrook's correctional file was to make the jury aware of the allegedly unfair treatment imposed on Westbrook by the state since his initial contact with incarceration at the age of fourteen. Denied psychological assistance from the state to show the effects of incarceration, counsel's best alternative was to introduce the record of incarceration itself. The action was clearly designed and in our judgment indicates a strategic decision. Such decisions have repeatedly been held not to render counsel's representation constitutionally deficient. *See, e.g., Williams v. Wainwright,* 681 F.2d 732 (11th Cir.1982); *Nelson v. Estelle,* 642 F.2d 903 (5th Cir.1981); *United States v. Guerra,* 628 F.2d 410 (5th Cir.1980), *cert. denied,* 450 U.S. 934, 101 S.Ct. 1398, 67 L.Ed.2d 369 (1981). Even if such a strategy appears harmful in retrospect, constitutionally ineffective assistance does not automatically follow. *Baty,* 666 F.2d 391, 395 n. 8; *Baldwin v. Blackburn,* 653 F.2d 942, 946 (5th Cir.1981), *cert. denied,* 456 U.S. 950, 102 S.Ct. 2021, 72 L.Ed.2d 475 (1982).

Because we find trial counsel's sentencing phase performance based on a tactical and considered decision, Westbrook's right to effective representation in this respect was not denied. Westbrook's remaining challenges to his counsel's performance are meritless and warrant no discussion.

### C.   Sentencing Phase Jury Instructions [15]

■ In the sentencing phase of Westbrook's trial subsequent to the jury's guilty verdicts on all counts, the trial court allowed presentation of evidence of aggravating and mitigating circumstances. The state elected not to present any additional

---

**15.** See the discussion on exhaustion in footnote 6.

evidence of aggravating circumstances and as discussed above, Westbrook's trial counsel introduced Westbrook's institutional record and presented testimony from a university psychology professor. Following jury arguments by counsel for both sides, the trial court instructed the jury. According to Westbrook, the court's instructions or lack of instructions in five specific areas rendered the sentencing instructions constitutionally inadequate. Westbrook contends that the court (1) failed to define statutory aggravating circumstances; (2) failed to define and describe the nature and function of mitigating circumstances; (3) informed the jury that it was not required to consider mitigating circumstances; (4) failed to instruct on the relationship between aggravating and mitigating circumstances; and (5) failed to explain that a life sentence could be recommended although aggravating circumstances were found. The majority of these contentions are not supported when the sentencing instructions are fully examined. We find, however, that the court failed to define and describe for the jury the nature and function of mitigating circumstances. Cognizant of the standard applicable in federal habeas corpus proceedings, we reach this conclusion not viewing singular aspects of the charge in isolation, but as a whole to determine the charge's adequacy. *Cupp v. Naughton,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973); *Davis v. McAllister,* 631 F.2d 1256, 1260 (5th Cir.1980), *cert. denied,* 452 U.S. 907, 101 S.Ct. 3035, 69 L.Ed.2d 409 (1981); *Stephens v. Zant,* 631 F.2d 397, 405 (5th Cir.1980), *reh'r denied and modified,* 648 F.2d 446 (5th Cir.1981), *cert. granted,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982) (case certified to Georgia Supreme Court). Westbrook's first challenge to the instructions—failure to define statutory aggravating circumstances—is unsupportable. The instructions indicate that the court charged the jury on the application of Ga. Code Ann. § 17–10–30(b). That statutory provision states the aggravating circumstances which may be considered by the

jury if supported by the evidence. The court read those statutory aggravating circumstances applicable to the evidence in the case, relied upon by the state in seeking the death penalty, and made known to Westbrook prior to trial.[16] Under the facts in this case, the trial court was required to do no more regarding the applicable statutory aggravating circumstances than to repeat the exact statutory language. This contention presents no basis for habeas corpus relief.

Westbrook strenuously argues that the court reversed itself when instructing on the consideration of mitigating circumstances. Westbrook takes issue with the following portion of the charge:

> You are authorized to consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment which may have been submitted to you. However, it is not essential to your decision that you find extenuating or mitigating facts and circumstances on the one hand, or facts and circumstances in aggravation on the other. Please do not confuse this with a charge which I shall give you a little bit later insofar as a statutory aggravating circumstance may be concerned.

Referring to this passage as "cryptic and confusing," Westbrook contends that this instruction failed to even remotely hint at what the term "circumstances ... in ... mitigation" means. More forcefully, Westbrook alleges that this passage runs contrary to Supreme Court admonitions that the sentencer not be precluded from considering any relevant mitigating evidence. *See Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). When examined closely, however, the passage attacked by Westbrook does not generate a deliberation process inconsistent with the teachings of *Eddings* and *Lockett.*

The Constitution requires that capital sentencing procedures "allow the partic-

---

**16.** These aggravating circumstances found in Ga.Code Ann. § 17–10–30(b)(2) and (7) are set out in section III. D of this opinion, pp. 1503–1504.

ularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition on him of a sentence of death." *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976) (plurality opinion). In this regard, the *Lockett* plurality stated that "the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record, and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original). As *Eddings* notes, "the sentencer must be free to give 'independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation.'" 455 U.S. at 112, 102 S.Ct. at 874, 71 L.Ed.2d at 8 (*quoting Lockett,* 438 U.S. at 605, 98 S.Ct. at 2965). We find nothing in the court's instruction that either precludes or restricts the jury's consideration of mitigating evidence. The court "*authorized* [the jury] to *consider* the facts *and circumstances, if any, in extenuation, mitigation, or aggravation of punishment which may have been submitted to you.*" By this charge, the court adequately instructed the jury on what matters it could consider in reaching a decision as to penalty. The court added that "it is not essential *to your decision* that you *find* extenuating or mitigating facts and circumstances on the one hand, or facts and circumstances in aggravation on the other." Nothing in this statement instructs the jury not to consider evidence in mitigation or aggravation; only that the ultimate decision as to penalty did not necessarily require as its basis a *finding* of *both* mitigating and aggravating circumstances. Before a death penalty can be imposed, the law of Georgia requires that one of the statutory aggravating circumstances set out in Ga.Code Ann. § 17–10–30(b) be found to exist beyond a reasonable doubt. Ga.Code Ann. § 17–10–31; *Gregg v. Georgia,* 428 U.S. 153, 196–97, 96 S.Ct. 2909, 2936, 49 L.Ed.2d 859 (1976). Con-

versely, where no aggravating circumstances are found to exist beyond a reasonable doubt, the appropriate sentence is life imprisonment. Ga.Code Ann. § 17–10–31; *Gregg,* 428 U.S. 153, 207–08, 96 S.Ct. 2909, 2941, 49 L.Ed.2d 859 (White, J., concurring). Nothing in the Georgia death penalty statute, however, requires that the jury *find both* evidence in mitigation and aggravation in order to recommend a sentence of death. The trial court is required to include in its instructions to the jury that it may consider any mitigating circumstances authorized by law. Ga.Code Ann. § 17–10–30(b). We do not interpret the cited instruction as precluding consideration of Westbrook's evidence in mitigation. Therefore, we find no disregard for *Lockett's* admonishment in this portion of the instruction.

■ Westbrook assigns further error to the sentencing phase charge by contending that it failed to specify that the jury could recommend life imprisonment although aggravating circumstances were found. This argument is without merit. In its charge, the court called the jury's attention to the specific statutory aggravating circumstances filed by the state and served on the defendant. The court listed the aggravating circumstances and informed the jurors that written copies would be taken with them to the jury room. The court also gave instructions on the verdict forms to be completed by the jury. The form, which was read by the court to the jury, consists of three possible verdicts. The first provides that if the jury finds the applicable statutory aggravating circumstances to exist, which the foreperson must write in on the verdict form, the jury may recommend the defendant's punishment be death. The second possible verdict provides that the jury may find an applicable statutory aggravating circumstance to exist, but that it may "recommend mercy or that the defendant's punishment be life imprisonment." The remaining possibility provides for the situation where no aggravating circumstances are found by the jury and, therefore, the jury recommends that the defend-

ant's punishment be life imprisonment. The court also charged the jury that

> [y]ou do not have to make up your own statutory aggravating circumstance, you only have to determine whether you think that one or other of those claimed as to the various counts did, in fact, exist. And then you must either make one recommendation for death or a recommendation for mercy and life imprisonment, and, of course, as the law says, if you find no statutory aggravating circumstances, then the defendant would have to be sentenced to life imprisonment in accordance with the law.

As the charge makes clear, the jury was properly apprised that a finding of an applicable aggravating circumstance and a recommendation that Westbrook be sentenced to life imprisonment was one of the possible results it could reach. Therefore, the instructions adequately follow the law of this circuit requiring clear instructions on the option to recommend life imprisonment although aggravating circumstances are found. *See Goodwin v. Balkcom,* 684 F.2d 794, 801–02 (11th Cir.1982); *Spivey v. Zant,* 661 F.2d 464, 470 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982); *Chenault v. Stynchcombe,* 581 F.2d 444, 448 (5th Cir.1978). Because we find no error in this aspect of the charge, Westbrook's argument on this ground fails to support his petition for habeas corpus relief.

A full examination of the charge, however, does reveal constitutionally deficient instructions furnishing a basis for habeas corpus relief. The charge fails to provide clear instructions on the function of mitigating circumstances and no guidance on the relationship between mitigating and aggravating circumstances. As *Spivey v. Zant* teaches, jury instructions must "describe the nature and function of mitigating circumstances" and "communicate to the jury that the law recognizes the existence of facts or circumstances which, though not justifying or excusing the offense, may properly be considered in determining whether to impose the death sentence."

661 F.2d at 472 (footnote omitted). *See also Coker v. Georgia,* 433 U.S. 584, 590–91, 97 S.Ct. 2861, 2865, 53 L.Ed.2d 982 (1977). The *Spivey* court explained that most cases will require the court to "tell the jury what a mitigating circumstance is and what its function is in the jury's sentencing deliberations." 661 F.2d at 471 (footnote omitted).

Although the charge authorized the jury to consider circumstances in extenuation or mitigation, *see* portion of charge cited, *supra,* at 1501, the court failed to explain what function such a consideration would play in sentencing deliberations. An authorization to consider mitigating circumstances is a hallow instruction when unaccompanied by an explanation informing the jury why the law allows such a consideration and what effect a finding of mitigating circumstances has on the ultimate recommendation of sentence. We cannot fit this instruction within the requirements of *Spivey.* "Capital sentencing instructions which do not clearly guide a jury in its understanding of mitigating circumstances and their purpose ... violate the eighth and fourteenth amendments." *Goodwin,* 684 F.2d 794, 801–02 (footnote omitted). Therefore, Westbrook's habeas corpus petition seeking relief from his death sentences must be granted on this ground because of the sentencing instruction's inadequacies concerning the nature and function of mitigating circumstances.

### D. Unconstitutional Application of Statutory Aggravating Circumstances

Prior to trial, the state notified Westbrook and his attorney that the following statutory aggravating circumstances found in Ga.Code Ann. § 17–10–30(b) would be relied upon to furnish the necessary basis for the death penalty. For the murder charge in Count I, the aggravating circumstances cited were:

> (1) That the murder was committed in the commission of another capital felony, to-wit, kidnapping with bodily injury. [§ 17–10–30(b)(2)]
>
> (2) The offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity

of mind, or an aggravated battery to the victim. [§ 17–10–30(b)(7)]

(3) The murder was committed in the commission of another capital felony, to-wit, murder. [§ 17–10–30(b)(2)]

As for the murder charge in Count III, the statutory aggravating circumstances cited were as follows:

(1) The murder was committed in the commission of another capital felony, to-wit, kidnapping with bodily injury. [§ 17–10–30(b)(2)]

(2) The offense of murder was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim. [§ 17–10–30(b)(7)]

In both of Westbrook's death sentences, the jury found that the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery upon the victim. Ga.Code Ann. § 17–10–30(b)(7). The jury also found that the aggravating circumstances of commission of another capital felony, murder, was applicable to the murder charge in Count I.

■ In *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the Supreme Court recognized that Georgia courts must satisfy certain criteria in order to impose a death sentence based upon a finding of the aggravating circumstance under Ga.Code Ann. § 17–10–30(b)(7). The task before the United States Supreme Court in *Godfrey* was to determine whether the Georgia Supreme Court had adopted a broad and vague construction of the (b)(7) aggravating circumstance so as to violate the eighth and fourteenth amendments to the United States Constitution. Fundamental to the Court's consideration was the requirement that sentencing instructions "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for impos-

ing a sentence of death.'"[17] In *Godfrey,* the state trial court both orally and in writing quoted the statutory language of the (b)(7) aggravating circumstance in its entirety, as did the court at Westbrook's trial. Acknowledging that persons of ordinary sensibility could characterize almost every murder as fitting within the (b)(7) language, Justice Stewart, writing for the plurality, observed that, because the trial court failed to explain the meaning of any of (b)(7)'s terms, "the jury's interpretation of § (7) [could] only be the subject of sheer speculation." 446 U.S. at 429, 100 S.Ct. at 1765. Westbrook asserts that, because the language of (b)(7) fails to restrain the arbitrary and capricious infliction of the death sentence, *Godfrey* requires trial courts to impose a limiting instruction upon (b)(7) in the jury charge. This contention has been previously raised in this court. To date, we have not required a limiting instruction in every case. *Stanley v. Zant,* 697 F.2d 955, 971 (11th Cir.1983).

■ Analyzing the sentencing review procedures set forth in Ga.Code Ann. § 17–10–35(c)(2), the *Godfrey* plurality intimated that the uncontrolled discretion of an uninstructed jury could be cured by review in the Georgia Supreme Court. Under section 17–10–35(c)(2), the Georgia Supreme Court may not affirm a judgment of death until it has independently assessed the evidence of record and determined that such evidence supports the jury's finding of an aggravating circumstance. Interpreting two Georgia Supreme Court opinions, *Blake v. State,* 239 Ga. 292, 236 S.E.2d 637, *cert. denied,* 434 U.S. 960, 98 S.Ct. 492, 54 L.Ed.2d 320 (1977), and *Harris v. State,* 237 Ga. 718, 230 S.E.2d 1 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2642, 53 L.Ed.2d 251, *rehearing denied,* 434 U.S. 882, 98 S.Ct. 247, 54 L.Ed.2d 166 (1977), the *Godfrey* plurality determined that the Georgia Supreme Court had reached three consistent conclusions regarding the (b)(7) aggravating circumstance. First, evidence that the offense was "outrageously or wan-

**17.** *Quoting Gregg v. Georgia,* 428 U.S. 153, 198, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (plurality opinion); *Proffitt v. Florida,* 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (plurality opinion); and *Woodson v. North Carolina,* 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976) (plurality opinion).

tonly vile, horrible or inhuman" must demonstrate "torture, depravity of mind, or an aggravated battery to the victim." Second, the phrase, "depravity of mind," comprehends only the type of mental state that leads a murderer to torture or to commit an aggravated battery before killing his victim. Finally, the word "torture," must be construed in pari materia with "aggravated battery" thus requiring evidence of serious physical abuse before death. 446 U.S. 420, 431, 100 S.Ct. 1759, 1766, 64 L.Ed.2d 398. The facts in *Godfrey* indicate that no torture or aggravated battery preceded the victims' deaths.[18] The evidence produced at Westbrook's trial, however, revealed quite the contrary. As stated in *Godfrey*, "the validity of the ... death sentence [ ] turns on whether, *in light of the facts and circumstances of the murders* ..., the Georgia Supreme Court can be said to have applied a constitutional construction of the phrase 'outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind ...'." 446 U.S. at 432, 100 S.Ct. at 1767 (emphasis added) (footnote omitted). The plurality concluded that it could not. We concur in that conclusion based on the fact that the Georgia Supreme Court in *Godfrey v. State* had before it no evidence demonstrating that the victims were tortured or subjected to aggravated battery. Therefore, under the circumstances of that case, the Georgia Supreme Court's review failed to satisfy the criteria previously set forth in the *Harris* and *Blake* cases. Whereas in *Godfrey* the Georgia Supreme Court applied the (b)(7) aggravating circumstance in an unconstitutional manner, the same cannot be said here. The evidence produced at Westbrook's trial supports the conclusions reached by the Georgia Supreme Court respecting the (b)(7) aggravating circumstance; thus, the court's finding that the evidence and verdict were factually substantiated is supported by its own interpretations of (b)(7) in *Harris* and *Blake*.

We find that the aggravating circumstance in Ga.Code Ann. § 17–10–30(b)(7) upon which Westbrook's death sentences were at least partially based, was not applied in an impermissibly vague or overbroad manner. Westbrook's argument on this ground fails to furnish a basis for habeas corpus relief.[19]

18. Three times during the course of his argument, the prosecutor in *Godfrey* told the jury that the case involved no allegations of torture or aggravated battery. In addition, the trial court indicated in its sentencing report that the murders did not involve torture. *Godfrey*, 446 U.S. 420, 432, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398. Just the opposite occurred at Westbrook's trial. The prosecutor stated that the crimes were committed "[n]ot fast and mercifully, but slowly and cruelly and with great torture and with great pain and great fear, and great anguish and great misery." The trial court's sentencing report indicates that both victims were tortured prior to death.

19. Even if we were to hold that Ga.Code Ann. § 17–10–30(b)(7) was applied in an overbroad and vague manner thereby voiding Westbrook's death penalty on Count III, the jury also found another aggravating circumstance in its recommendation of death on Count I, that the murder was committed while in the commission of another capital felony, to-wit: murder. Ga.Code Ann. § 17–10–30(b)(2). Thus, assuming Westbrook's death sentence on Count III was unconstitutionally imposed, he is still under a sentence of death pursuant to the jury's recommendation on Count I. Westbrook argues that a death sentence based in part on a finding of an invalid circumstance cannot stand even where the jury finds another valid circumstance as held in *Stephens v. Zant*, 631 F.2d 397 (5th Cir.1980), *modified on other grounds on panel reh'r*, 648 F.2d 446 (5th Cir.1981), *cert. granted*, 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222 (1982). In *Stephens*, the trial court permitted the jury to consider four statutory aggravating circumstances, one of which was found to be impermissibly vague following Stephens's trial, but before his case was reviewed by the Supreme Court of Georgia. In *Arnold v. State*, 236 Ga. 534, 224 S.E.2d 386 (1976), the Supreme Court of Georgia held unconstitutional the portion of Ga.Code Ann. § 27–2534.-(b)(1) [1933 Code] encompassing persons who have a "substantial history of serious assaultive criminal convictions" because it did "not provide the sufficiently 'clear and objective standards' necessary to control the jury's discretion in imposing the death penalty." 236 Ga. 534, 540, 224 S.E.2d 386, 391 (*quoting Coley v. State*, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974)). Eliminating this circumstance from consideration of Stephens's appeal, the Georgia Supreme Court found the evidence supported the jury's findings of the other aggravating circumstances and held the death sentence was not impaired. *Stephens v. State*,

### E. Admission of the Confession of Westbrook's Co-Indictee

Westbrook contends that the state trial court violated his sixth amendment right of confrontation by allowing the confession of his co-indictee, Eddie William Finney, to be introduced at Westbrook's trial. Westbrook claims that because he was not jointly tried, the statements attributable to Finney could only have been introduced as evidence against him, and the trial court's failure to give a cautionary instruction compounded the violation. After examining the record, we cannot agree with Westbrook that the state trial court abridged his right to confront witnesses.

On September 27, 1977, Macon Police Sergeant William L. Hutcheson's interrogation of Westbrook and Finney resulted in inculpatory statements from Westbrook explicitly recounting the crimes. At trial, the state called Sgt. Hutcheson to testify concerning Westbrook's statements. When Sgt. Hutcheson began to relate statements made by Westbrook and statements made by Finney, Westbrook's counsel objected and argued that the introduction of a confession by a non-testifying co-indictee would violate Westbrook's right of cross-examination as explained in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[20] The state countered this argument by asserting that although Finney was present, he only verified the correctness of Westbrook's confession. Sgt. Hutcheson informed the court that Westbrook did most of the talking and that Finney only confirmed Westbrook's statements.

The trial court agreed with the state and instructed Sgt. Hutcheson to specify what statements were attributable to whom when referring to the interrogation occurring on September 27. Thereafter, the prosecutor asked Sgt. Hutcheson to explain the facts surrounding the crimes according to the statements adduced from Westbrook. Further questioning by the prosecutor solicited testimony only on the basis of Westbrook's statements. Contrary to Westbrook's contention that this testimony introduced a confession by Finney, we read Sgt. Hutcheson's testimony as a singular account

237 Ga. 259, 261–62, 227 S.E.2d 261, 263 (1976), cert. denied, 429 U.S. 986, 97 S.Ct. 508, 50 L.Ed.2d 599 (1977). Entertaining Stephens's federal habeas corpus petition, the former Fifth Circuit held that Stephens's death sentence could not stand because the presence of an unconstitutional statutory aggravating circumstance made it impossible for a reviewing court to satisfactorily determine whether the unconstitutional aggravating circumstance decisively affected the jury's verdict. Stephens, 631 F.2d 397, 406. On certiorari, the United States Supreme Court observed that the Georgia Supreme Court consistently held that "[w]here two or more statutory aggravating circumstances are found by the jury, the failure of one circumstance does not so taint the proceedings as to invalidate the other aggravating circumstance found and the sentence based thereon." Zant v. Stephens, 456 U.S. 410, 414, 102 S.Ct. 1856, 1857, 72 L.Ed.2d 222, 226 (1982). The Court then certified the following question to the Georgia Supreme Court: "What are the premises of state law that support the conclusion that the death sentence in this case is not impaired by the invalidity of one of the statutory aggravating circumstances found by the jury?" 456 U.S. at 416, 102 S.Ct. at 1859, 72 L.Ed.2d at 227–28. In its answer, the Georgia Supreme Court reasoned that, where a jury separately considers and finds each of two stat-

utory grounds supporting the death penalty, the fact that one ground is subsequently declared void does not require reversal of a death penalty recommendation, where all the evidence submitted to establish the invalid ground is admissible aside from its relevance to the invalid ground. Zant v. Stephens, 250 Ga. 97, 297 S.E.2d 1 (1982). Because we invalidate Westbrook's death sentences on other grounds, see section III. C of this opinion, we issue no dispositive ruling on Westbrook's argument. We are inclined to believe, however, that the Georgia Supreme Court's answer to the certified question renders Westbrook's claim meritless.

**20.** In Bruton, the Supreme Court held that where a codefendant does not testify in a joint trial, the introduction of his confession "add[s] substantial, perhaps even critical, weight to the government's case in a form not subject to cross-examination," and violates the sixth amendment right of the defendant against whom the confession is introduced. 391 U.S. 123, 128, 88 S.Ct. 1620, 1623, 20 L.Ed.2d 476. The Court held further that this encroachment on the sixth amendment right could not be cured by instructing the jury to disregard the confession as evidence implicating the defendant against whom it was introduced.

of Westbrook's confession. Under no reasonable interpretation of this testimony can it be said that Hutcheson's interrogation of Westbrook and Finney resulted in a confession by Finney implicating Westbrook. Thus, *Bruton* is inapplicable.

Westbrook also argues that Sgt. Hutcheson repeated statements attributable to Finney, and his general narrative made it impossible for the jury to separate statements of Westbrook from those of Finney. The record fails to support this argument. Both the prosecutor and Sgt. Hutcheson heeded the trial court's instruction by indicating that only Westbrook's statements formed the basis for Hutcheson's testimony. Furthermore, the state trial court's failure to instruct the jury to consider any statements by Finney only as evidence against him is easily explained. Because the prosecutor qualified the questions propounded to Sgt. Hutcheson by including such phrases as "according to Westbrook's statements," "[in] the words of Westbrook," and "just what [Westbrook] said," and in light of the court's preliminary instruction to Hutcheson, the jury never heard statements other than Westbrook's confessions to the crimes. Finney's agreement with Westbrook's version falls far short of a singular implication of Westbrook. Because no statement from Finney was placed before the jury, it was unnecessary for the court to give a limiting instruction. *Cf. Parker v. Randolph,* 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) (admission of interlocking confessions with proper limiting instructions conforms to sixth amendment requirements). We find no deprivation of the sixth amendment right of cross-examination in Westbrook's state trial and thus, this argument fails to provide a basis for habeas corpus relief.

### CONCLUSION

We affirm the district court's denial of habeas corpus relief insofar as it rejects Westbrook's contention that the state trial court abused its discretion in refusing to provide funds with which to obtain expert psychological assistance. We also affirm the denial by rejecting Westbrook's contentions concerning an unconstitutional application of the aggravating circumstances found in the Georgia death penalty statute, Ga.Code Ann. § 17–10–30(b)(7), and by rejecting his argument alleging the admission of a confession of his co-indictee, Finney.

We reverse the denial insofar as it rejects Westbrook's contention regarding ineffective assistance based on conflict of interest and remand to the district court for further proceedings as discussed in section III. B of this opinion. We reverse the denial in part because we find the sentencing phase jury instructions constitutionally inadequate. Accordingly, we instruct the district court to issue the writ of habeas corpus vacating Westbrook's death sentences, subject to the state's right to resentence within a reasonable time. This time period shall be scheduled by the district court.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

---

CLARK, Circuit Judge, concurring in part and dissenting in part:

> Unquestionably, a defendant in a capital murder trial must be allowed to proffer, and a jury permitted to consider, any evidence of mitigation submitted as a basis for a sentence less than death.

(Majority opinion at 1495), citing *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978).

In preparing Westbrook's defense, his counsel discovered that Westbrook had spent the majority of his life incarcerated in a variety of prisons. In 1951, at the age of 14, Westbrook was found guilty on eleven counts of burglary for which he was sentenced to consecutive five-to-ten year terms, and three misdemeanor counts for which he was sentenced to consecutive one-year terms, for a total of 58 to 113 years.[1]

---

1. The following chart, based on trial exhibits, lists the crimes charged against Westbrook and

the subsequent sentences imposed:

Westbrook spent the next twenty years in the Georgia State Penal System.[2] Westbrook was confined in an adult prison, after two years in a boys' training institute,

| Case No. | Crime Charged | Date of Crime | Plea | Date of Sentencing | Sentence Imposed |
|---|---|---|---|---|---|
| 3124 | Burglary (theft of cigarettes from store house) | 11/17/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3125 | Burglary (theft of piggy bank containing $10) | 11/6/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3126 | Burglary (theft of shoes, jacket & toy bank) | 11/6/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3127 | Burglary (theft of pistol & flashlight) | 12/5/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3128 | Burglary (theft of candy cigarettes) | 11/18/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3129 | Burglary (theft of wallet and flashlight) | 12/5/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3130 | Burglary (attempted theft) | 11/17/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3131 | Burglary (theft of piggy bank containing $5) | 12/5/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3133 | Burglary (theft of $3) | 11/18/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3134 | Burglary (theft of clothes & pistol) | 11/*/51 | Guilty | 12/8/51 | 5–10 years Consecutive |
| 3135 | Burglary (attempted theft) | 12/5/51 | Guilty | 12/8/51 | * |
| 3314 | Burglary (theft of 2 purses and 1 ring) | 12/5/51 | Guilty | 12/12/51 | 5–10 years Consecutive |
| 3315 | Carrying Pistol Without a License | 12/5/51 | Guilty | 12/12/51 | 1 year Consecutive |
| 3316 | Simple Larceny (theft of 1 boy's bicycle) | 12/5/51 | * | 12/12/51 | 1 year Consecutive |
| 3317 | Carrying Concealed Pistol | 12/5/51 | * | 12/12/51 | 1 year Consecutive |
| | | | | Total: | 58–113 years |

* Not apparent from the record.

2. Westbrook's prison records are summarized below:

Westbrook's Prison History:

| | |
|---|---|
| 12/18/51 | Westbrook (age 14) transferred from county jail to Boys Industrial Training Institute |
| 9/8/53 | Westbrook (age 16) transferred to State Penitentiary at Reidsville |
| 3/9/56 | Westbrook stabbed by another inmate. |
| 12/31/56 | Westbrook (age 20) transferred to Lowndes County Public Works Camp |
| 7/2/60 | Westbrook transferred to Reidsville (reason: physical condition) |
| 8/10/71 | Westbrook paroled |
| 7/30/73 | Westbrook arrested for violating parole by attempting to sell stolen goods |
| 11/9/73 | Parole revoked |
| 1/10/75 | Parole granted |
| 1/10/75 | Westbrook's full sentence commuted to 38–60 years |

Note 2—Continued

Punishment Reports:

| Date | Incident | Punishment: Number of days in isolation on restricted diet |
|---|---|---|
| **Reidsville** | | |
| 3/24/54 | destroying state property | 30 |
| 8/10/54 | beating inmate with a stick | 10 |
| 6/9/55 | unsatisfactory work | 10 |
| 6/23/55 | fighting inmate Oglesby | 30 |
| 11/28/55 | hanging blankets around his bed | 10 |
| 3/15/56 | unsatisfactory work | 5 |
| 5/19/56 | unsatisfactory work & lying | 20 |
| 6/20/56 | stabbing inmate Oglesby | 30 |
| 8/30/56 | fighting | 20 |
| 8/31/56 | smuggling stolen tobacco into isolation | 10 |
| **Lowndes County Public Works Camp** | | |
| 3/7/57 | possession of tobacco can of potash | 20 |
| 5/27/59 | escape (additional 2 year prison sentence imposed) | 30 |
| 9/9/59 | escape (2 year prison sentence imposed, concurrent with other 2 year sentence) | 30 |
| 2/1/60 | fighting | Not apparent from the record |
| **Reidsville** | | |
| 8/29/60 | out of dormitory | 20 |
| 11/1/61 | possession of knife | 5 |
| 12/26/61 | fighting with inmate, running from officer | 5 |
| 4/20/62 | laying in on a forged lay-in | 15 |
| 6/11/62 | out of dormitory | 10 |
| 10/29/62 | refusing to line up when so ordered | 10 |
| 12/26/62 | gambling & drinking | 10 |
| 3/9/64 | talking after lights out | 5 |
| 6/22/64 | in possession of another's property | 4 |
| 1/4/65 | playing record player at 5:00 a.m. | 3 |
| 3/5/65 | talking after lights out | 5 |
| 3/30/65 | fighting | 10 |
| 4/19/65 | going to the power house | 7 |
| 7/7/65 | lying to officer to gain entry to another inmate's cell | 6 |
| 9/16/65 | unsatisfactory work: mashing zippers with press | 5 |
| 6/21/66 | laying down in cell & refusing to get up for count | 10 |
| 7/28/69 | passing shorts in mess hall | 7 |
| 1/6/70 | out of dormitory | 12 |
| 7/8/70 | in bed with another inmate | 14 |
| 7/27/70 | fighting | 14 |
| 1/3/71 | fighting | 7 |

where he allegedly suffered physical abuse and homosexual attacks by other prisoners. Westbrook's counsel believed that to prepare an adequate defense, he should request psychiatric or psychological assistance to evaluate the impact of these many years of incarceration on Westbrook. Exposure to this environment at an immature age could have diminished Westbrook's mental development and his capacity to know right from wrong. Counsel thus sought expert testimony to introduce evidence of these aspects of Westbrook's character and record, which must be considered as mitigating circumstances under *Lockett v. Ohio,* 438 U.S. at 604, 98 S.Ct. at 2965, 57 L.Ed.2d at 989. Such evidence could have shown that Westbrook had been so dehumanized and brutalized by prison that his ability to function properly in society had been impaired at an early age.

As indicated by the majority, Westbrook's counsel orally moved the state trial court to appoint a qualified psychologist or psychiatrist. Counsel informed the court that the expert was to determine the effects of Westbrook's incarceration in the state penal system on the development of his personality and his ability to conform to acceptable societal standards. Given Westbrook's tragic history, counsel's *only* strategy for the sentencing hearing was to present evidence of Westbrook's penal history and testimony by an expert who could explain to the jury how the incarceration itself affected Westbrook's character.

The trial court declined to appoint, at state expense, psychological or psychiatric diagnostic expert assistance, absent an intention by Westbrook to plead insanity at the time the crime was committed or incompetency to stand trial. Westbrook's indigency prevented his obtaining private diagnostic assistance. The only volunteer psychologist who could be found was unlicensed and had little clinical experience, with no experience in a prison setting. The trial judge concluded that this psychologist was not an expert with any age group of

incarcerated people. Furthermore, the psychologist had never examined appellant and could only respond to hypothetical questions.

There is strong support for Westbrook's contention that incarceration at an early age could have had a lasting detrimental impact. Thomas J. Cottle, a psychologist at Harvard Medical School, wrote:

> Most of the cases with which I have been involved were children who have been deeply hurt by serving an extended jail term. The jail experience may well be called traumatic. Years after a person's release, the psychological and physical symptoms resulting from incarceration still may be detected.

T. Cottle, *Children in Jail,* Crime and Delinquency, p. 318 (1979). Other effects of incarceration of adolescents are documented in Kenneth Wooden's book, *Weeping in the Playtime of Others.* Dr. Karl Menninger, one of this country's most outstanding psychiatrists, has also recognized what tragic impacts extended incarceration can have:

> A place where idle, frustrated, unkempt, frightened, resentful men are pushed into physical and psychological intimacy and left to await someone else's pleasure and convenience is a prime breeding place of evil and violence.

> . . . .

> The frustration of the prisoner's ability to make choices and the frequent refusals to provide an explanation for the regulations and commands descending from the bureaucratic staff involve a profound threat to the prisoner's self-image because they reduce the prisoner to the weak, helpless, dependent status of childhood.

K. Menninger, *The Crime of Punishment,* pp. 43, 74–75 (1968).

The Supreme Court has explicitly recognized that the eighth and fourteenth amendments require individualized consid-

eration of mitigating factors in capital cases. *Lockett v. Ohio,* 438 U.S. at 606, 98 S.Ct. at 2965, 57 L.Ed.2d at 989. In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court reversed a decision where the death sentence was imposed without considering in mitigation the circumstances of petitioner's unhappy upbringing and emotional disturbance. In sentencing, the *Eddings* trial court had stated that it would not consider Eddings' violent background and concluded that the only mitigating circumstance was Eddings' youth. On appeal, the Court of Criminal Appeals stated that the evidence in mitigation was not relevant because it did not tend to provide a legal excuse from criminal responsibility. The Supreme Court ruled that the limitation placed by the court on its consideration of mitigating evidence had violated the rule in *Lockett v. Ohio.* Thus, in *Eddings* the Court first resolved that the evidence Eddings offered was relevant mitigating evidence and, second, that the courts could not refuse to consider such evidence. The Court said:

> [I]t is not disputed that [Eddings] was a juvenile with serious emotional problems, and had been raised in a neglectful, sometimes even violent, family background. In addition, there was testimony that Eddings' mental and emotional development were at a level several years below his chronological age. All of this does not suggest an absence of responsibility for the crime of murder, deliberately committed in this case. Rather, it is to say that just as the chronological age of a minor is itself a relevant mitigating factor of great weight, *so must the background and mental and emotional development of a youthful defendant be duly considered in sentencing.*

455 U.S. at 116, 102 S.Ct. at 877, 71 L.Ed.2d 12 (emphasis added). The very evidence which the Court determined was crucial for Eddings' sentencing determination was the expert testimony of psychologists, psychiatrists, and sociologists. I respectfully sub-

mit that Westbrook's case is controlled by *Eddings,* which the majority fails to distinguish.

I agree with the majority's holding that:

> We interpret *Lockett v. Ohio* and *Gregg v. Georgia* as vehicles for extending a capital defendant's *right* to present evidence in mitigation to the placing of an *affirmative duty* on the state to provide the funds necessary for production of the evidence. Permitting an indigent capital defendant to introduce mitigating evidence has little meaning if the funds necessary for compiling the evidence is unavailable.

(Majority opinion at 1496). The majority, and I, read *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), "to require the state to furnish the services of a psychologist or psychiatrist in those capital cases deemed appropriate by the state trial court." (Majority opinion at 1496). The majority next states that under Georgia law the appointment of an expert was a matter of trial court discretion. With no further explanation, the majority concludes:

> Accordingly, the trial court's ruling on such a request is tested by the abuse of discretion standard. Applying that standard in this case, we disagree with Westbrook's assertion that the denial of his request rendered the sentencing phase of his trial fundamentally unfair.

(Majority opinion at 1497). The majority does not suggest under what facts, if ever, it would find a trial court had abused its discretion in failing to appoint an expert.

The majority justifies its conclusion with two final contentions: (1) the evidence for which Westbrook sought a psychologist could have been demonstrated by other methods, and (2) the evidence sought by Westbrook was "not a critical piece of evidence determinative of his guilt or innocence of the offenses charged." (Majority opinion at 1497). I find neither conten-

tion persuasive. As to the first, the majority suggests that evidence of the impact of incarceration could have been provided by other witnesses such as family and friends. I disagree. First, there is no evidence of the existence of such persons. Second, such other witnesses could only speculate, as did the inexperienced psychologist who answered hypothetical questions, on the impact of imprisonment on Westbrook. Permitting Westbrook to have an expert to examine him and then testify would have given his defense greater credibility and, more importantly, enabled his counsel to attempt to determine the true impact of his incarceration.

The importance of psychiatric testimony in capital cases is the theme of several recent law review articles. One article notes that no Supreme Court since 1944 has explicitly refused to admit psychiatric evidence of mental disorder in mitigation. Liebman and Shepard, *Guiding Capital Sentencing Discretion Beyond the 'Boilerplate': Mental Disorder as a Mitigating Factor,* 66 Geo.L.J. 757, 794 (1978). Another commentator is more specific in his recommendation:

> An indigent defendant charged with a capital crime should be provided a comprehensive forensic evaluation, at state expense, to assist his attorney in exploring and presenting his "defenses," *including evidence in exculpation or mitigation.* Because this evaluation should be viewed as essential to the effective assistance of counsel, the evaluation should be conducted for the defense by a qualified forensic specialist on terms similar to those arranged by defendants with means to pay for their own defense.

Bonnie, *Psychiatry and the Death Penalty: Emerging Problems in Virginia,* 66 Va.L. Rev. 167, 186 (1980).

The Supreme Court opinion in *Eddings* reveals that Eddings' evidence in mitigation included testimony of a state psychologist, a sociologist specializing in juvenile offenders, and a psychiatrist. 455 U.S. at 107, 102 S.Ct. at 872, 71 L.Ed.2d at 6. The expert testimony included opinions that Eddings' mental and emotional development were at a level several years below his age and that Eddings could be rehabilitated. Testimony about Eddings' difficult childhood by friends and relatives could not have risen to the same level of persuasiveness and credibility as the expert testimony for Eddings, just as it could not for Westbrook.

The majority's second contention, in support of its conclusion that Westbrook's sentencing hearing was not rendered fundamentally unfair, is that the expert testimony sought was "not a critical piece of evidence determinative of his guilt or innocence of the offense charged." (Majority opinion at 1497). Thus, the majority attempts to distinguish the present case from *Barnard v. Henderson,* 514 F.2d 744 (5th Cir.1975), in which we held that: "Fundamental fairness is violated when a criminal defendant on trial for his liberty is denied the opportunity to have an expert of his choosing, bound by approximate safeguards imposed by the Court, examine a piece of critical evidence whose nature is subject to varying expert opinion." 514 F.2d at 746. While I agree that psychiatric testimony would not determine Westbrook's guilt or innocence, I do not find that distinction dispositive. In a capital case, the defendant is entitled to present both evidence of his innocence and evidence in mitigation, in two separate proceedings. Georgia law provides that a jury "shall consider" any mitigating circumstances. Westbrook had only one possible means of establishing mitigating circumstances: expert testimony of the impact of incarceration. This testimony was critical to the sentencing phase of his trial.

Moreover, the majority's argument was rejected by the Supreme Court. In *Eddings,* the Court of Criminal Appeals followed the trial court's approach and "found that the evidence in mitigation was not

relevant because it did not tend to provide a legal excuse from criminal responsibility." 455 U.S. at 113, 102 S.Ct. at 875, 71 L.Ed.2d at 10. The Supreme Court rejected this approach and explicitly held that the evidence had to be considered in mitigation even though it did not go to Eddings' guilt or innocence. I believe the same result should ensue in this case.

I do not contend that all indigent defendants should be entitled to a court-appointed psychologist or psychiatrist, just as indigent defendants are not entitled to unlimited use of experts in other fields. I agree with the majority that a state trial court should consider the specific facts of each case and the importance of the requested expert testimony. The record in this case, however, indicates that the trial court did not believe it *could* appoint a psychologist or psychiatrist in the absence of an intent to plead insanity.[3] Just as the trial judge in *Eddings* erroneously believed as a matter of law that he could not consider the proffered mitigating evidence, the trial judge for Westbrook erroneously believed that he could not comply with Westbrook's request. Even if the record indicated that the denial of psychological or psychiatric help was an exercise of discretion, I would hold that under the facts of this case such a denial renders the sentencing fundamentally unfair and thus constitutes an abuse of discretion.

Westbrook's *only* evidence in mitigation was his history of incarceration and its unfortunate, and as yet unexplored, impact. The relevance of such testimony was affirmed in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1. In refusing to appoint a qualified psychiatrist for Westbrook, the court effectively denied consideration of an important mitigating factor.

3. In ruling on Westbrook's motion for the appointment of a psychologist or psychiatrist, the trial court stated:

[O]n your oral motion for examination and evaluation, with the motion contained as a part of it that you are not asking it for purposes of determining whether or not he knew the difference between right or wrong at the time of the commission of the offense, I think

I respectfully dissent from Part III.A of the majority opinion and concur in all other issues.

that answers the obligation on my part that I have in any way to appoint an expert opinion.... I think the request itself, in and of itself, by saying that it is not for that purpose [of pleading insanity], but some other purpose, I would deny that.

Record, Exhibit 2 (Transcription Trial Motions) at 35.