Christopher A. BURGER, Plaintiff-Appellee, Cross-Appellant,

v.

Walter A. ZANT, Warden, Georgia Diagnostic and Classification Center, Defendant-Appellant, Cross-Appellee.

No. 81–7419.

United States Court of Appeals, Eleventh Circuit.

Oct. 13, 1983.

Rehearing and Rehearing En Banc Denied Feb. 13, 1984.

William B. Hill, Jr., Asst. Atty. Gen., Atlanta, Ga., for defendant-appellant, cross-appellee.

Millard Farmer, Joe Nursey, Andrea I. Young, Pamela L.J. Arangno, Atlanta, Ga., for plaintiff-appellee, cross-appellant.

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD *, District Judge.

VANCE, Circuit Judge:

The state of Georgia appeals the district court's grant of a petition for a writ of habeas corpus setting aside the death sentence of Christopher Burger.

The facts in this case are set out in the district court's opinion. *Burger v. Zant,* 513 F.Supp. 772, 788–89 (S.D.Ga.1981). Briefly, Christopher Burger and Thomas Stevens, both soldiers at Fort Stewart, Georgia, were indicted for the murder of Roger Honeycutt, also a soldier. On September 4, 1977, Burger and Stevens decided to rob a taxicab driver. The victim, who supplemented his military income by driving a taxi, picked up the two men. Burger and Stevens threatened Honeycutt with knives, forced him to stop the cab and robbed him of sixteen dollars. The victim was placed in the back seat of the cab with Stevens. As Burger drove the vehicle, Stevens forced Honeycutt to disrobe and then to participate in acts of oral and anal sodomy. The victim, nude and bound, was then placed in the trunk of the cab.

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama, sitting by designation.

With Honeycutt still in the trunk, Burger drove the cab to the local airport, where he and Stevens met a friend and fellow soldier, James Botsford. As they drove back to Fort Stewart, Burger and Stevens explained what they had done, confirming their story by exchanging remarks with Honeycutt in the trunk. After some discussion, Botsford convinced his friends to promise to release Honeycutt unharmed. They dropped Botsford off at the post.

Burger and Stevens then drove to a nearby "borrow pit" which was filled with water. After removing their fingerprints from the cab and removing its radio, Burger raised the trunk and asked Honeycutt if he was all right. Honeycutt responded affirmatively. Burger then closed the trunk, started the car and drove it into the pond, jumping out as it entered the water. The victim died by drowning.

Christopher Burger was convicted of murder and sentenced to death. Stevens was tried separately, convicted, and also sentenced to death. *Stevens v. State,* 242 Ga. 34, 247 S.E.2d 838 (1978). On direct appeal to the Georgia Supreme Court, Burger's conviction was affirmed but his death sentence was vacated and the case remanded for resentencing. *Burger v. State,* 242 Ga. 28, 247 S.E.2d 834 (1978).

On remand, Burger was once again sentenced to death and the sentence was affirmed by the Supreme Court of Georgia. *Burger v. State,* 245 Ga. 458, 265 S.E.2d 796 (1980). The United States Supreme Court denied certiorari. 448 U.S. 913, 101 S.Ct. 31, 65 L.Ed.2d 1175 (1980).

After unsuccessfully exhausting available state post-conviction remedies, Burger filed a petition for a writ of habeas corpus in federal district court. The district judge granted the writ insofar as it vacated Burger's death sentence.

The state of Georgia as appellant and Burger as appellee/cross-appellant raise five issues before this court: whether Burger was denied effective assistance of counsel; whether the jury instructions impermissibly shifted the burden of proof onto the defendant; whether *Miranda* violations occurred; whether the district court properly vacated Burger's death sentence where the jury instructions concerning two of the three aggravating circumstances upon which it was based were insufficient; and whether the jury instruction on the aggravating circumstance set out in Ga.Code Ann. § 27–2534.1(b)(7) sufficiently channeled the discretion of the jury to impose the death sentence.[1] All of these questions were carefully analyzed in District Judge Edenfield's opinion. 513 F.Supp. at 788–803. As to the first three issues, we adopt Judge Edenfield's opinion as our own. The final two issues require discussion.

(1)

The *Stephens* Issue

Christopher Burger's sentencing jury based its death sentence upon three statutory aggravating circumstances: (a) the "offense of murder was committed while the offender was engaged in the commission of another capital felony, kidnapping"; (b) the "offense of murder was committed while the offender was engaged in the commission of another capital felony, armed robbery"; (c) the offense of murder was "outrageously or wantonly vile, horrible or inhuman in that it involved torture and depravity of mind." On direct review, the Georgia Supreme Court held that the trial court had erroneously failed to instruct the jury on the definitions of kidnapping and robbery. The Georgia Supreme Court upheld the death sentence, however, based on the single remaining aggravating circumstance. *Burger v. State,* 265 S.E.2d at 800.

The district court vacated Burger's death sentence, holding that the Supreme Court of Georgia's disposition of the first two aggravating circumstances rendered the entire verdict invalid. The district judge

---

1. In addition, Burger challenges the sufficiency of the evidentiary hearing conducted by the district court. This contention is patently frivolous. The most cursory examination of the district judge's opinion demonstrates the care with which he treated the case and the seriousness with which he regarded the issues raised by Burger.

based his decision on our opinion in *Stephens v. Zant,* 631 F.2d 397, *modified on panel rehearing,* 648 F.2d 446 (5th Cir. 1981),[2] and Burger and Georgia agree that *Stephens* controls this issue in the present case. Certiorari was granted in the United States Supreme Court in *Zant v. Stephens,* 454 U.S. 814, 102 S.Ct. 90, 70 L.Ed.2d 82 (1981), *question certified to the Georgia Supreme Court,* 456 U.S. 410, 102 S.Ct. 1856, 72 L.Ed.2d 222, *question answered,* 250 Ga. 97, 297 S.E.2d 1 (1982).

■ On June 22, 1983, the United States Supreme Court decided *Zant v. Stephens,* — U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), reversing the judgment rendered by a panel of the former fifth circuit. The Court held that under the Georgia capital punishment statute the invalidity of one of a plurality of statutory aggravating circumstances does not require that the entire death sentence be vacated. The Court found the death penalty in that case permissible because there were two remaining aggravating circumstances that "adequately differentiate[d that] case in an objective, evenhanded, and substantively rational way from the many Georgia murder cases in which the death penalty may not be imposed." *Id.* at ——, 103 S.Ct. at 2744. So long as "at least one of a plurality of aggravating circumstances found by the jury is valid and supported by the evidence," *Zant v. Stephens,* 456 U.S. 410, 414, 102 S.Ct. 1856, 1857, 72 L.Ed.2d 222 (1982), the death sentence may stand. We thus reverse the district court's order compelling resentencing based on our opinion in *Stephens.*

(2)

The *Godfrey* Issue

Burger also challenged the adequacy of the trial court's charge on the sole remaining aggravating circumstance that was applied in his case. Under Ga.Code Ann. § 17–10–30(b)(7), a jury may impose the death penalty if it finds that the defendant's crime was "outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim." Since "[i]t is, of course, arguable that any murder involves depravity of mind or an aggravated battery," *Gregg v. Georgia,* 428 U.S. 153, 201, 96 S.Ct. 2909, 2938, 49 L.Ed.2d 859 (1976), the potential subjectivity of § (b)(7) has made it the target of numerous constitutional challenges. Although the Supreme Court ruled that § (b)(7) was not unconstitutional on its face in *Gregg,* the Court conceded that the statutory language might be subject to abuse if the Georgia Supreme Court were to adopt "an open-ended construction" of its terms. *Id.* Four years later, the Court re-examined the operation of § (b)(7) in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), and concluded that the Georgia courts had strayed from the straight and narrow path marked out in *Gregg.* In *Godfrey,* there was no allegation that the murders committed by the defendant involved either torture or an aggravated battery, and the sentencing jury based its imposition of the death penalty on the simple grounds "that the offense of murder was outrageously or wantonly vile, horrible and inhuman." The Georgia Supreme Court upheld the sentence on review, but the Supreme Court reversed. Writing for a plurality of the Court, Justice Stewart held that the jury's findings were an insufficient basis for imposing the death penalty, because "nothing in these few words, standing alone ... implies any inherent restraint on the arbitrary and capricious infliction of the death sentence." *Id.* at 428, 100 S.Ct. at 1765. Although Justice Stewart found that the Georgia Supreme Court in *Godfrey* had ignored its responsibility "to keep § (b)(7) within constitutional bounds," *id.* at 429, 100 S.Ct. at 1765, he noted that other decisions by that court had placed a limiting construction on the statute

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc) this circuit adopted as precedent all former fifth circuit cases submitted or decided prior to October 1, 1981. In *Stein v. Reynolds Sec., Inc.,* 667 F.2d 33, 34 (11th Cir.1982), the court held that Unit B panel or en banc court decisions of the former fifth circuit also are binding precedent in the eleventh circuit.

that was sufficient to bring § (b)(7) within the ambit of constitutional acceptability:

> The *Harris* [*v. State,* 237 Ga. 718, 230 S.E.2d 1] and *Blake* [*v. State,* 239 Ga. 292, 236 S.E.2d 637] opinions suggest that the Georgia Supreme Court had by 1977 reached three separate but consistent conclusions respecting the § (b)(7) aggravating circumstance. The first was that the evidence that the offense was "outrageously or wantonly vile, horrible or inhuman" had to demonstrate "torture, depravity of mind, or an aggravated battery to the victim." The second was that the phrase, "depravity of mind," comprehended only the kind of mental state that led the murderer to torture or to commit an aggravated battery before killing his victim. The third, derived from *Blake* alone, was that the word, "torture," must be construed *in pari materia* with "aggravated battery" so as to require evidence of serious physical abuse of the victim before death.

*Id.* 446 U.S. at 431, 100 S.Ct. at 1766. As long as the Georgia courts observed these precedents, Justice Stewart suggested, death sentences imposed on the basis of § (b)(7) would meet the requirements of *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

In the present case, the trial judge charged the jury that one of the bases for imposing the death penalty was a finding "that the offense of murder was outrageously or wantonly vile, horrible or inhumane [sic] in that it involved torture and depravity of mind." Burger contends that this was insufficient to provide adequate guidance to the jury, and asserts that the trial court was required under *Godfrey* to explain and limit the meaning of § (b)(7) in accordance with the construction of the statutory language and Georgia case law presented by Justice Stewart in the plurality opinion.[3] The district court did not expressly address the issue of whether a limiting construction was required at the sentencing phase, but two recent decisions of this circuit have rejected the argument that *Godfrey* requires the trial court to supply additional definitions or a limiting instruction in its charge to the jury. *See Westbrook v. Zant,* 704 F.2d 1487, 1501, 1504 (11th Cir.1983); *Stanley v. Zant,* 697 F.2d 955, 971 (11th Cir.1983).

The facts of *Stanley* in particular have some similarity to those in this case. Ivon Ray Stanley and his codefendant robbed

---

3. We note in passing that Burger did not object to the (b)(7) instruction at the resentencing hearing. This does not bar review of the issue under the doctrine of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), however, for either of two reasons. First, we address the issue because the Georgia Supreme Court ruled on its merits. *Burger v. State,* 265 S.E.2d at 799–800. This court recently observed that "[c]onsiderations of comity and federalism have resulted in the development of a well-settled exception to the procedural default rule of *Sykes:* where a state appellate court does not rely on a procedural default, but reaches the merits of the federal law claim, the *Sykes* bar is inapplicable." *Booker v. Wainwright,* 703 F.2d 1251, 1255 (11th Cir.1983). Because in the present case the Georgia Supreme Court "entertained the federal claims on the merits, a federal habeas court must also determine the merits of appellant's claim." *Lefkowitz v. Newsome,* 420 U.S. 283, 292 n. 9, 95 S.Ct. 886, 891 n. 9, 43 L.Ed.2d 196 (1975). *See also County Court v. Allen,* 442 U.S. 140, 154, 99 S.Ct. 2213, 2223, 60 L.Ed.2d 777 (1979); *Francis v. Henderson,* 425 U.S. 536, 542 n. 5, 96 S.Ct. 1708, 1711 n. 5, 48 L.Ed.2d 149 (1976);

*Westbrook v. Zant,* 704 F.2d 1487, 1491 n. 6 (11th Cir.1983); *Henry v. Wainwright,* 686 F.2d 311, 313 (5th Cir. Unit B 1982), *on remand from* 457 U.S. 1114, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982); *Machetti v. Linahan,* 679 F.2d 236, 238 n. 4 (11th Cir.1982); *Washington v. Watkins,* 655 F.2d 1346, 1368 (5th Cir. Unit A 1981), *cert. denied,* 456 U.S. 949, 102 S.Ct. 2021, 72 L.Ed.2d 474 (1982); *Sasoon v. Stynchcombe,* 654 F.2d 371, 374 (5th Cir.1981); *Moran v. Estelle,* 607 F.2d 1140, 1142–43 (5th Cir.1979); *Cannon v. Alabama,* 558 F.2d 1211, 1216 n. 12 (5th Cir. 1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1281, 55 L.Ed.2d 792 (1978).

Second, the state has not raised the procedural default issue and thus it must be deemed waived. *See Goode v. Wainwright,* 704 F.2d 593, 596 n. 1, 612 n. 25 (11th Cir.1983); *Washington v. Watkins,* 655 F.2d at 1368; *Smith v. Estelle,* 602 F.2d 694, 708 n. 19 (5th Cir.1979), *aff'd,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1980); *LaRoche v. Wainwright,* 599 F.2d 722, 724 (5th Cir.1979). *Cf. Lamb v. Jernigan,* 683 F.2d 1332, 1335 n. 1 (11th Cir.1983) (state waives exhaustion requirement by failing to raise it).

their victim at gunpoint, then compelled him to accompany them to a wooded area where they beat and shot him before burying him alive. At the sentencing phase of Stanley's trial, the judge charged the jury in terms that were essentially identical to those employed by the trial court in the present case, instructing them that they could impose the death penalty if they found that Stanley's offenses were "outrageously and wantonly vile, horrible and inhuman, in that the offenses involved Defendant's depravity of mind and torture to the victim." *Stanley*, 697 F.2d at 971–72. The jury found that Stanley's offense "involved depravity of mind and torture to the victim" and sentenced him to death. *Id.* This court distinguished *Stanley* from *Godfrey* on the grounds that the charge used in the former (as well as in this case) required the jury to find that the crime involved both torture *and* depravity of mind, whereas the formulation used by the trial judge in *Godfrey* was phrased in the disjunctive language of the statute and permitted the jury to sentence the defendant to death on finding that the crime evidenced either torture or depravity of mind or an aggravated battery.[4] The jury's findings in *Godfrey* did not make it apparent which, if any, of these factors it had relied on in sentencing the defendant to death, and the absence of any evidence suggesting that the defendant had tortured or physically abused his victims before their deaths led Justice Stewart to conclude that there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey*, 446 U.S. at 433, 100 S.Ct. at 1767. In contrast, the instructions given the *Stanley* and *Burger* juries prevented them from imposing the death sentence unless they found

that the victims had in fact been tortured before death. Since the jurors in each of these cases made an explicit finding that torture had occurred, we cannot say that their reasons for imposing the death penalty must remain "the subject of sheer speculation." *Id.* at 429, 100 S.Ct. at 1765. The only remaining questions are first, whether there was anything about the instructions as given that might have led the jurors to base their sentence on a mistaken interpretation of state law, *see Sandstrom v. Montana*, 442 U.S. 510, 517, 99 S.Ct. 2450, 2455–56, 61 L.Ed.2d 39 (1979), and second, whether the state law as applied in this case is constitutional.

Burger contends that the trial judge's instructions in his case were defective because they did not set forth Justice Stewart's construction of the Georgia law from *Godfrey*. With regard to the first two points in Justice Stewart's analysis, however, Burger's objections are easily disposed of. Although the trial judge did not expressly specify that the jury could not find that a crime was "outrageously or wantonly vile, horrible or inhuman" without making a specific finding that it demonstrated "torture, depravity of mind, or an aggravated battery to the victim," the jury in this case—unlike the jury in *Godfrey*—returned a verdict that clearly revealed its understanding that the two clauses were interrelated. Burger also contends that the jury should have been instructed that it could not find "depravity of mind" without finding that the defendant had tortured or physically abused the victim before his death. The trial judge in *Burger*, however, clearly linked "torture and depravity of

---

4. The Georgia Supreme Court has stressed the importance of the fact that § (b)(7) is worded in the disjunctive, rather than the conjunctive. Thus, "[i]t is not required that a trier of fact find the existence of each disjunctive phrase in the statute, only that at least one phrase of the first clause of the statute exists due to the existence of at least one phrase of the second clause of the statute." *Fair v. State*, 245 Ga. 868, 268 S.E.2d 316, 320 (1980). Although the

trial judge's charge in *Godfrey* was therefore technically correct, the jury returned a report that did not specify which, if any, of the phrases in the second clause was the basis of its death sentence. In addition, the potential subjectivity of the phrase "depravity of mind" renders a death sentence that is based upon that phrase alone more suspect than one that is based on both "depravity of mind" and one of the other factors as well. *See* note 5 *infra*.

mind" in his instructions, and the jury's verdict did likewise.[5]

Burger's final objection to the trial court's charge is somewhat more troublesome. He asserts that the jury should have been instructed that the word "torture" assumes the existence of an aggravated battery and therefore requires evidence of serious physical abuse of the victim before death. In *Stanley* and *Westbrook,* this aspect of Justice Stewart's opinion was not problematic, since it was not disputed that in both of those cases the defendant had inflicted extreme physical abuse on his victim prior to the murder itself. *See Westbrook,* 704 F.2d at 1505 & n. 18; *Stanley,* 697 F.2d at 972. In dictum, however, the *Stanley* court reflected that "[arguably], the undefined word 'torture' [might] fall[ ] short of meeting the [*Godfrey*] test because in a given case a jury might understand it to mean mental torture rather than a word to be read *in pari materia* with 'aggravated battery' to require evidence of serious physical abuse." *Stanley,* 697 F.2d at 972. There was no contention in *Stanley* that "the torture to which his victim was subjected was anything other than physical," *id.,* but the situation in the present case is far less clear. In *Burger,* the jury might have viewed the evidence that was presented in a number of different ways. The jury

found that Burger had tortured his victim, and the evidence supports a finding beyond a reasonable doubt that Honeycutt was tortured before he died. There was sufficient evidence from which the jury may properly have concluded that Burger aided and abetted his codefendant Stevens in physically torturing Honeycutt, as well as that he personally tortured Honeycutt both physically and psychologically. On the other hand, it is also conceivable that the jury may have found that while Stevens physically tortured Honeycutt, Burger inflicted only psychological torture on him.[6] This case therefore requires us to answer the question which we raised but did not resolve in *Stanley:* whether there is any significant distinction between mental or psychological and physical torture under either the law of Georgia or the Constitution. If the latter is within constitutional limits but the former is not, *Sandstrom* requires that the jury must receive instructions to this effect.

The deliberate infliction of mental anguish certainly comes within the commonly understood meaning of the word "torture,"[7] and the sole support which Burger offers for his argument that the court should hold differently is the language of

[5.] Our consideration today does not reach the situation presented by a charge of depravity of mind not involving torture or aggravated battery. That question is obviously a more difficult one in the light of *Gregg* and *Godfrey.* Cf. *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir. 1983) (section (b)(7) charge stated in the disjunctive held not to require instruction in excess of statutory language). Contrary to the conclusion of Justice Stewart in *Godfrey,* the Georgia Supreme Court in a line of cases extending well before that opinion has upheld findings of depravity of mind based on such factors as age of the victim, physical characteristics of the victim and mutilation, disfigurement or sexual abuse *after* death. *See Phillips v. State,* 250 Ga. 336, 297 S.E.2d 217 at 221.

[6.] The district court's correct analysis of the evidence is as follows:

Of course, the present case involves many circumstances which may readily be seen as involving "torture" and reflecting "depravity of mind." There was ample evidence upon which the jury might have found that petitioner aided and abetted in Stevens' sodomiz-

ing the victim prior to his death. Serious sexual abuse has been equated with "torture" under Georgia law. *House v. State,* 232 Ga. 140, 205 S.E.2d 217 (1974). Similarly, serious physical abuse can readily be seen in the confining of the victim in the car trunk for a period of hours, bound, nude and certainly anxious in the extreme over his captors' intentions. Likewise, there can be little argument but that petitioner's sadistic inquiry into Private Honeycutt's condition prior to submerging the taxi well-demonstrated "depravity of mind" and, further, that the victim's horror as the trunk inexorably filled amounted to "torture."

513 F.Supp. 798–99.

[7.] In pertinent part, the definition of torture provided by *Webster's New Collegiate Dictionary* is as follows:

1: the infliction of intense pain (as from burning, crushing, or wounding) to punish, coerce, or afford sadistic pleasure 2a: anguish of body or mind: agony b: something that causes agony or pain.

Justice Stewart's plurality opinion in *Godfrey.* As an initial matter, it is important to emphasize that the *Godfrey* plurality's reversal of the death sentences imposed in his case ultimately stemmed not from its dissatisfaction with the jury instructions, but from its belief that the Georgia Supreme Court had failed to carry out its place in the statutory scheme given conditional approval in *Gregg.*

> In past cases the State Supreme Court has apparently understood this obligation of carrying with it the responsibility to keep § (b)(7) within constitutional bounds .... Thus, the validity of the petitioner's death sentences turns on whether, in light of the facts and circumstances of the murders that he was convicted of committing, the Georgia Supreme Court can be said to have applied a constitutional construction of the [statute].

446 U.S. at 429, 432, 100 S.Ct. at 1765, 1767. Thus, the key inquiry in the minds of the *Godfrey* plurality was whether the Georgia Supreme Court had kept faith with its own expressed standards in reviewing the defendant's sentences of death. Justice Stewart found that it had not done so in *Godfrey,* basing this view on his construction of the Georgia statute and case law. He noted, however, that his research was limited to cases pre-dating 1978, and he conceded that the third of the "separate but consistent conclusions" which he deduced from the Georgia case law—the requirement that torture be construed *in pari materia* with "aggravated battery"—was derived from a single decision, *Blake v. State,* 239 Ga. 292, 236 S.E.2d 637 (1977). The basis for Justice Stewart's conclusion was apparently the Georgia Supreme Court's statement that it "[c]onsider[ed] torture and aggravated battery on the one hand *as substantially similar treatment* of the victim and depravity of mind on the other hand as relating to the defendant ...." 236 S.E.2d 643 (emphasis added).

Although Justice Stewart's construction of the Georgia law on this point was strongly criticized at the time, *see, e.g., Godfrey,* 446 U.S. at 435–36, 100 S.Ct. at 1768–69 (Marshall, J., concurring in the judgment); 446 U.S. at 443, 100 S.Ct. at 1772–73 (Burger, C.J., dissenting); Donohue, *Godfrey v. Georgia: Creative Federalism, the Eighth Amendment, and the Evolving Law of Death,* 30 *Cath.U.L.Rev.* 13, 44–47 (1980), the Georgia Supreme Court subsequently affirmed its adherence to his construction in *Hance v. State,* 245 Ga. 856, 268 S.E.2d 339 (1980), where the court noted that "[t]orture occurs when the victim is subjected to serious physical abuse before death." 268 S.E.2d at 345. The *Hance* court went on, however, to embrace an expansive definition of the term "serious physical abuse":

> Serious sexual abuse may be found to constitute serious physical abuse. [citation omitted] Torture also occurs when the victim is subjected to an aggravated battery as hereinabove defined. Evidence of psychological abuse by the defendant to the victim before death where it is shown to have resulted in severe mental anguish to the victim in anticipation of physical harm may amount to serious physical abuse (i.e., torture of the victim), and also will support a finding of depravity of mind of the defendant.

*Id.* Subsequent decisions by Georgia's highest court have reaffirmed its interpretation of "physical abuse" as including both sexual and psychological abuse as well. *See, e.g., Phillips v. State,* 250 Ga. 336, 297 S.E.2d 217, 221 (1982); *Brown v. State,* 247 Ga. 298, 275 S.E.2d 52, 58 (1981).

Since the Georgia law therefore follows common usage in finding that the deliberate infliction of mental anguish constitutes "torture," we conclude that the trial court's failure to elaborate or define the term further does not run afoul of the rule in *Sandstrom.* In meaningful contrast to the more amorphous term "depravity of mind," "torture" has a readily understandable and generally understood meaning. This excludes a reasonable risk that the jury might give it an unintended interpretation.

We see no basis for concluding that the definition of "torture" applied by the Georgia courts violates substantive federal constitutional guarantees. The central theme

of the Supreme Court's death penalty jurisprudence has always been that the states must draft and apply their capital punishment laws in a manner that "genuinely narrow[s] the class of persons eligible for the death penalty," *Zant v. Stephens,* —— U.S. at ——, 103 S.Ct. at 2742–43, thereby providing a "principled basis for distinguishing [a] case, in which the death penalty [is] imposed, from the many in which it [is] not." *Godfrey,* 446 U.S. at 433, 100 S.Ct. at 1767. The Georgia Supreme Court has recently demonstrated that it will not allow the category of psychological abuse to become all-inclusive.[8] In *Phillips v. State, supra,* the court emphasized that a finding of "serious psychological abuse" required a showing that "the defendant inflicted deliberate, offensive and prolonged pain on his victim prior to death." 297 S.E.2d at 221. Thus, "the mere apprehension of death, immediately before the fatal wounds are inflicted" was found insufficient to justify a finding of "torture" under § (b)(7). *Id.*

We therefore decide that a death sentence may constitutionally be imposed under § (b)(7) based on a finding that the defendant inflicted either psychological or physical torture upon his victim. We can discern no principled basis for attempting to distinguish the two, and it seems highly questionable that Justice Stewart meant to draw such a distinction in *Godfrey.* The standards applied by the Georgia courts certainly restrict the class of persons eligible for the death penalty by reason of the "torture" provision of § (b)(7), and the facts of this case easily place it within the core of those the statute was designed to reach. Burger's contentions must therefore be rejected.

Having concluded that both phases of Burger's trial are free of constitutional error, we reverse the judgment of the district court and remand with instructions that the writ be denied.

REVERSED and REMANDED.

JOHNSON, Circuit Judge, dissenting:

I concur in the majority's opinion except that, for the following reasons, I dissent from that part of the opinion adopting the district court's opinion and order, 513 F.Supp. at 795–98, denying Burger's petition for habeas corpus relief on the grounds that he was denied the right to effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments at both of his state court trials and on appeal to the Supreme Court of Georgia. A review of the record reveals that Burger was denied the effective assistance of counsel both by his appointed counsel's active representation of his co-indictee's conflicting interest and by his counsel's failure to present any evidence in mitigation at either of his two sentencing proceedings.

A review of the general principles applicable to all ineffective assistance of counsel claims is in order. The Sixth Amendment guarantees a criminal defendant the right to *"effective* assistance of counsel, that is, counsel reasonably likely to render and rendering effective assistance." *Washington v. Strickland,* 693 F.2d 1243, 1250 (5th Cir. Unit B 1982) (en banc), *cert. granted,* —— U.S. ——, 103 S.Ct. 2451, 77 L.Ed.2d 1332 (1983). The appropriate methodology for determining whether there has been effective assistance of counsel is to examine the totality of circumstances in the record. *Baty v. Balkcom,* 661 F.2d 391, 394 (5th Cir. Unit B 1981). Although neither in capital nor in noncapital cases is defendant entitled to error-free counsel, the "number, nature and seriousness of the charges against the defendant are all part of the 'totality of the circumstances in the entire record' that must be considered in the effective assistance calculus." *Washington v. Watkins,* 655 F.2d 1346, 1357 (5th Cir.1981).

Turning first to Burger's conflict of interest claim, in order to establish the constitutional predicate for ineffective assistance

---

**8.** Here, of course, as in *Zant v. Stephens,* our decision "depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality." —— U.S. at ——, 103 S.Ct. at 2749.

Burger must show that his counsel actively represented actually conflicting interests. *Cuyler v. Sullivan,* 446 U.S. 335, 349–50, 100 S.Ct. 1708, 1718–19, 64 L.Ed.2d 333 (1980); *Westbrook v. Zant,* 704 F.2d 1487, 1499 (11th Cir.1983). Applying this standard to the facts of this case, the record is clear that Burger's counsel was actively representing both Burger and his co-indictee Stevens and that an actual conflict of interest between the two violated Burger's right to the effective assistance of counsel.[1]

First, it is apparent that Burger's counsel actively represented both Burger and Stevens. Both Burger and Stevens were charged with and indicted for the murder of Roger Honeycutt. Both Burger and Stevens were appointed counsel by the trial court at approximately the same time, and within a few weeks after they had been charged with the crime. Burger's appointed counsel, Leaphart, and Stevens' appointed counsel, Smith, were partners in a two-partner law firm. At the federal habeas hearing, Leaphart testified that he interviewed both Burger and Stevens. Leaphart testified that he assisted Smith in the prep-

aration of Stevens' case and that Smith assisted him in the preparation of Burger's case. Leaphart and Smith discussed the issues involved in each case and researched the law together. Smith sat at counsel table and assisted Leaphart during Burger's trial. Although not physically present at Stevens' trial, Leaphart testified that "I worked then with—discussed the issues with Bob [Smith]. We researched the law together."[2] Smith and Leaphart collaborated in preparing the briefs for both Burger and Stevens on each defendant's first appeal to the Supreme Court of Georgia; Leaphart testified that he "primarily" prepared the briefs for Burger and Stevens on the second appeal to the Supreme Court of Georgia.[3] The fee received by each attorney for representing each client was deposited in the law firm's corporate account. At no time in his representation of Burger did Leaphart or the trial court ever inform Burger of a possible conflict of interest.

Whether analyzed as a situation where one attorney, Leaphart, represented both Burger and Stevens,[4] or where one law firm represented both Burger and Stevens,[5] the

1. The Sixth Amendment guarantee of effective assistance of counsel necessarily includes the guarantee of conflict-free counsel. *Glasser v. United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464–65, 86 L.Ed. 680 (1942); *United States v. Alvarez,* 580 F.2d 1251, 1254 (5th Cir.1978).

2. Transcript of Federal Habeas Corpus Hearing ("THC") at 18.

3. THC at 40–41.

4. The warden-appellant argues that the conflict of interest cases relied upon by Burger are inapposite as involving the representation of multiple defendants by one attorney. Here, appellant contends, Burger and Stevens were represented by "separate" attorneys. This argument is contrary to the facts as reflected by the record. Leaving aside the fact that Leaphart and Smith were partners in the practice of law, the attorneys here were each active in the defense of the other's client and "seem to have viewed themselves as a defense 'team' acting on behalf of [both] of the accused." *United States ex rel. Sullivan v. Cuyler,* 593 F.2d 512, 515 (3d Cir.1979), *rev'd on other grounds, Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Leaphart consulted confidentially with Stevens, aided in preparing his case for trial, and prepared the briefs for both

of his appeals. "Whatever may have been the extent of each attorney's participation in the trial of the ... defendants, we are satisfied that it was sufficient to establish that both attorneys represented [both] defendants." *Id.*

5. "The same principles [governing Sixth Amendment conflict of interest claims] apply where the joint representation is by two members of the same firm." *Ross v. Heyne,* 638 F.2d 979, 983 (7th Cir.1980) (*quoting United States v. Helton,* 471 F.Supp. 397, 399 n. 1 (S.D.N.Y.1979)); *see also United States v. Donahue,* 560 F.2d 1039, 1042 (1st Cir.1977) ("[t]he same rule applies with equal force to representation of two or more defendants by members of the same law firm."). *Cf. Zuck v. Alabama,* 588 F.2d 436, 438 (5th Cir.1979) (ineffective assistance found where "[t]he law firm which served as counsel to Zuck in his murder trial also represented, in an unrelated civil matter, the state prosecutor who tried Zuck."); Fed.R.Crim.Pro. 44(c) ("[w]henever two or more defendants have been jointly charged ... and are represented by ... retained or appointed counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including

end result on these facts is the same: Leaphart was actively involved in the defense of both to the extent that a conflict of interest was clearly established.

Although multiple representation is the paradigm context in which conflict of interest claims arise,[6] a finding of multiple representation alone does not establish ineffective assistance of counsel. *Foxworth v. Wainwright,* 516 F.2d 1072 (5th Cir.1975). The conflict must be shown to be actual, not speculative, before it will cause representation to fail Sixth Amendment standards. *Baty v. Balkcom,* 661 F.2d at 397. "An actual conflict of interest occurs when a defense attorney places himself in a situation 'inherently conducive to divided loyalties.'" *Zuck v. Alabama,* 588 F.2d 436, 439 (5th Cir.1979) (*quoting Castillo v. Estelle,* 504 F.2d 1243, 1245 (5th Cir.1974)); *see also Baty v. Balkcom,* 661 F.2d at 397 ("[a]n actual conflict of interest exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another defendant whom the same counsel is representing.").

In this case, the fundamental issue, as perceived by counsel, was not that of guilt, but of culpability. Upon the habeas corpus hearing Leaphart testified at length concerning the evidence supporting Burger's lesser degree of culpability for the murder as compared to Stevens'.[7] Summarized, the evidence was that at the time the crime was committed Burger was seventeen; Stevens was twenty. Burger has an I.Q. of 82 and possible brain damage. Stevens appeared to be the leader in their relationship; Burger the follower. Stevens planned and initiated the robbery of the victim; Burger followed his instructions. Stevens actually committed the robbery; Stevens made the victim undress; Stevens forced the victim to perform oral sodomy on Stevens; Stevens anally sodomized the victim; Stevens tied the victim up and forced him to get in the trunk of the cab. Stevens told Burger they would have to kill him; Burger said he didn't want to kill him. Stevens told Burger they would have to get rid of the cab by driving it into the pond; Stevens ordered Burger to drive the cab with the victim locked in the trunk into the pond. Burger drove the cab and the victim into the pond. In short, the essence of Burger's defense was that he was less culpable than Stevens.

In such a situation, any evidence or arguments made by counsel in Burger's behalf would, by the very nature of Burger's defense, damage Stevens. An actual conflict of interest between Burger and Stevens is thus apparent. Stated differently, Burger's interests were drastically adverse to those of Stevens.

> If a defense attorney owes duties to a party whose interests are adverse to those of the defendant, then an actual conflict of interest exists. The interests of the other client and the defendant are sufficiently adverse if it is shown that the attorney owes a duty to the defendant to take some action that could be detrimental to his other client.

*Zuck v. Alabama,* 588 F.2d at 439.

The course of Burger's state court proceedings illuminates the duty owed him by Leaphart to take actions that could be detrimental to Stevens. First, Leaphart did not at any time in his representation of

---

separate representation."), *construed in Ross v. Heyne,* 638 F.2d at 983 ("[t]he Supreme Court's proposal of this rule indicates its recognition that the potential constitutional problems attendant to multiple representation are present when different attorneys from the same legal partnership represent co-defendants with conflicting interests."); *ABA Code of Professional Responsibility* DR 5–105(D). Further, the Supreme Court of Georgia, exercising its supervisory role over the Bar, has adopted a mandatory rule in death penalty cases that co-defendants must be provided with separate and independent counsel. *Fleming v. State,* 264 Ga. 90, 270 S.E.2d 185 (1980). This rule applies with equal force to representation by a single attorney or by members of the same law firm. *Id.* at 188 n. 7.

**6.** *See Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718 ("[a] possible conflict of interest inheres in almost every instance of multiple representation"); *United States v. Alvarez,* 580 F.2d 1251, 1254 (5th Cir.1978).

**7.** THC at 20–23.

Burger offer Burger's testimony against Stevens in exchange for a sentence less than the death penalty for Burger.[8] *See Baty v. Balkcom,* 661 F.2d at 397 n. 12 ("[p]lea bargains are perhaps the most obvious example of the manifest effects of a conflict of interest at pretrial proceedings."); *see also Fleming v. State,* 246 Ga. 90, 270 S.E.2d 185, 189 (1980) (Bowles, J., concurring) ("[n]o two defendants share equal responsibility for a crime. Usually one is more culpable than the other or for any number of reasons has a greater degree of responsibility for what occurred. One may also be more entitled to leniency based on such factors as age, intelligence, motive, background, previous conduct or record, etc. Common counsel eliminates any practical possibility of plea bargaining."). Second, at Burger's trial Stevens was not called as a witness by the defense. If Stevens had been called by the state, Leaphart would have been placed in the untenable position of cross-examining his own client. Finally, Leaphart prepared the briefs for both Burger and Stevens on each defendant's second appeal to the Supreme Court of Georgia. In Burger's brief, Leaphart does not argue that he was the less culpable party, although the scope of the Supreme Court of Georgia's appellate review in capital cases includes a consideration of whether the "sentence of death is excessive or disproportionate to the penalty in similar cases, considering both the crime and the defendant." O.C.G.A. § 17–10–35(c)(3) (1982), formerly Ga.Code Ann. § 27–2537(c)(3) (1933).

Once an actual conflict of interest is shown, without further inquiry, prejudice to the defendant is presumed. *Westbrook v. Zant,* 704 F.2d 1487, 1499 (11th Cir.1983).

"It is well established that when counsel is confronted with an actual conflict of interest, prejudice must be presumed, and except under the most extraordinary circumstances, the error cannot be considered harmless." *Baty v. Balkcom,* 661 F.2d at 395 (*quoting Turnquest v. Wainwright,* 651 F.2d 331, 334 (5th Cir.1981)). The rationale for dispensing with the requirement of a showing of prejudice in conflict of interest cases "becomes apparent when one considers the nigh impossible task of making a meaningful qualitative analysis of trial counsel proficiency, in a case involving divided loyalties, from an examination of the transcript alone." *Johnson v. Hopper,* 639 F.2d 236, 239 (5th Cir. Unit B 1981). The degree to which counsel's strategic decisions and performance throughout the course of his representation are affected by an actual conflict of interest subtly pervading the whole of the defense may not be manifested in his conduct at trial alone. "[T]he sixth amendment requires that a defendant may not be represented by counsel who might be tempted to dampen the ardor of his defense in order to placate his other client. The fact that a particular lawyer may actually resist the temptation is of no moment." *Zuck v. Alabama,* 588 F.2d at 440.

In light of this precedent it is clear that the presumption of prejudice arising from an actual conflict of interest cannot be overcome by evidence that counsel did, in fact, vigorously pursue one client's defense to the detriment of the other at trial. Although the factual content of the extraordinary circumstances in which the error of representing actually conflicting interests is considered harmless has not been delineated by this Court, it is apparent that a showing

---

**8.** At the federal habeas hearing, Leaphart testified that he had not, at any time during his representation of Burger, discussed with the district attorney the possibility of Burger's testifying against Stevens in return for a lighter sentence. THC at 38–39. When further questioned about plea negotiations in Burger's case, Leaphart testified that he had engaged in plea negotiations, but that "*during the first trial* [the district attorney] refused to discuss it in any terms." THC at 65 (emphasis supplied). From this account, it appears that plea negotiations were entered into in this case; that Leaphart never offered Burger's testimony against Stevens; and that, after Burger's first trial had begun, the district attorney refused to discuss a plea on whatever terms Leaphart had offered, presumably not the terms of Burger's testifying against Stevens since Leaphart testified he did not at any time make such an offer. Thus, appellant's argument that no *pretrial* conflict of interest could have arisen due to the district attorney's refusal to plea bargain is contradicted by the record.

of no adverse effect upon counsel's performance at trial or no impairment of his client's defense does not constitute such a circumstance.

Thus, accepting the district court's findings, those findings having been adopted by the majority in this case, that Leaphart "in no way tailored his strategy toward protecting Stevens" at Burger's trial, and that the trial record "shows considerable effort to gain mercy for petitioner by portraying Stevens as the chief architect of the crime," the presumption of prejudice from the actual conflict of interest between Burger and Stevens remains. Further, the actual conflict of interest between Stevens and Burger was not limited to Burger's trial, but permeated the entire course of Burger's state court proceedings. Once Burger established that an actual conflict of interest was present, whether at pretrial plea negotiations, trial or on appeal, and that his counsel actively represented both interests, his claim of ineffective assistance of counsel was complete.

I turn now to Burger's claim that he was denied the effective assistance of counsel because his counsel failed to present *any* evidence in mitigation, or otherwise, at either of his two sentencing proceedings. In *Stanley v. Zant,* 697 F.2d 955, 962 (11th Cir.1983), this Court rejected a claim that failure to present any mitigating evidence at the sentencing proceeding in addition to that presented at the guilt phase of the trial constituted per se ineffective assistance of counsel. Although, unlike Stanley's attorney, Burger's attorney did not present *any* evidence during either the guilt or two sentencing phases, it is not necessary to articulate a per se rule of ineffectiveness in this case as "application of general principles governing effectiveness of counsel to the specific context of a capital sentencing proceeding," *id.,* demonstrates the ineffectiveness of Burger's counsel.

Counsel's duty of effective representation continues into the sentencing phase of his client's trial. *King v. Strickland,* 714 F.2d 1481, at 1491 (11th Cir.1983).

The sentencing phase of any case regardless of the potential punishment, is 'the time at which for many defendants the most important services of the entire proceedings can be performed.' ABA Standard on Criminal Justice, Sentencing Alternatives and Procedures § 5.3(e). The special importance of the capital sentencing proceeding gives rise to a duty on the part of defense counsel to be prepared for that crucial phase of the trial. *Stanley v. Zant,* 697 F.2d at 963.

"At the heart of the duty of effective representation is the independent duty to investigate and prepare." *Goodwin v. Balkcom,* 684 F.2d 794, 805 (11th Cir.1982). In *Washington v. Strickland,* 693 F.2d 1243 (5th Cir. Unit B 1982), the en banc court delineated the content of this duty to investigate:

A strategy chosen without the benefit of a reasonably substantial investigation into all plausible lines of defense is generally based upon counsel's professional assumptions regarding the prospects for success offered by the various lines. The cases generally conform to a workable and sensible rule: when counsel's assumptions are reasonable given the totality of the circumstances and when counsel's strategy represents a reasonable choice based upon those assumptions counsel need not investigate lines of defense that he has chosen not to employ at trial.

\*　　\*　　\*　　\*　　\*　　\*

In sum, an attorney who makes a strategic choice to channel his investigation into fewer than all plausible lines of defense is effective so long as the assumptions upon which he bases his strategy are reasonable and his choices on the basis of those assumptions are reasonable. *Id.* at 1255, 1256 (footnotes omitted).

"An attorney may proceed absent a reasonable investigation into all potential lines of defense, but he does so at his peril." *Stanley v. Zant,* 697 F.2d at 966. Finally, once a showing of ineffective assistance of counsel due to counsel's failure to investigate has been made, the second prong of *Washington*

*v. Strickland* requires that prejudice from this error be demonstrated. *Id.* at 1258.

The district court found that Leaphart's investigation into available mitigating evidence consisted solely of conversations with Burger's mother. Although it is unclear what the content of those conversations, as relating to mitigating evidence concerning Burger's background outside of Wayne County, Georgia, and the identity of possible character witnesses, was found to be, the district court concluded that Leaphart made "adequate if hardly ideal inquiries," and that his "investigation appears to meet at least minimal professional standards." Clearly by no stretch of the imagination could Leaphart's investigation be characterized as reasonably substantial. Since Leaphart failed to conduct a reasonably substantial investigation into available mitigating evidence, in order to be effective his choice not to investigate must have been a reasonable strategic decision based upon reasonable assumptions. Three reasonable assumptions on which Leaphart's strategy not to substantially investigate available mitigating evidence have been proffered: 1) that Leaphart's theory of defense, or strategy, was to make the state prove its case; 2) that, if mitigating evidence had been offered at Burger's sentencing proceedings, Leaphart would have lost the right to opening and closing argument; and 3) that Leaphart chose to rely in closing on the argument that Burger had never been in trouble before, an argument which would have been undercut by an investigation into Burger's background. None of these strategies, and the assumptions on which they are based, withstand scrutiny for reasonableness.

Leaphart testified concerning his strategy or theory of defense in Burger's case:

> Well, of course, my theory of defense was of course trying to make the District Attorney prove his case. And my theory of defense was to—well, that in effect, in essence what it was. And, use whatever

rules of evidence and to prevent him from doing so.[9]

And, specifically concerning the second trial solely on the issue of penalty, Leaphart again testified that he "[f]elt that case should have been tried on the facts and make the District Attorney—I say make him, use whatever rules of evidence to exclude those harmful facts." [10] The law provides that the state must prove its case, whether defense counsel is present or not. Relying on the state's case is not a "strategy" for the defense, but instead reflects an abandonment of counsel's obligation to develop a case for his client. This proffered strategy is tantamount to no strategy at all, and reliance on such a strategy, especially in the context of a capital sentencing proceeding, as an alternative to substantially investigating available mitigating evidence is patently unreasonable.

Second, Leaphart testified that he made a decision not to offer any evidence in mitigation in order to preserve his right to opening and closing arguments. Again, the basic assumption on which this strategy was based is patently unreasonable. O.C.G.A. § 17–10–2(a) & (c) (1982), formerly Ga.Code Ann. § 27–2503(a) & (c) (1933), provide for the conduct of sentencing proceedings in capital cases: "The district attorney shall open and the defendant or his counsel shall conclude the argument." The presentation of evidence by the defendant at a capital sentencing proceeding in no way affects this division of argument between the state and the defense. In fact, this procedure was followed at Burger's sentencing proceedings: the district attorney opened and defense closed final arguments to the jury. Leaphart simply failed to inform himself of basic Georgia criminal procedure in sentencing proceedings. *Cf. Young v. Zant,* 677 F.2d 792 (11th Cir.1982). No strategy based on such a false assumption is reasonable. The district court clearly erred in concluding otherwise.

The district court found that Leaphart's failure to substantially investigate available

---

9. THC at 18.

10. THC at 52.

mitigating evidence was based on a strategic choice to rely in closing argument on the "major argument" in Burger's behalf that he had no prior record of violent crime and had never been in trouble before. As it relates to Burger's second sentencing proceeding, this finding is contradicted by the record: at no point in his closing argument did Leaphart mention the lack of evidence that Burger had a record or had been in trouble before. Instead, Leaphart's closing argument at the second sentencing proceeding argued Burger's lack of culpability as compared to Stevens', and concluded with the plea for mercy. Neither argument would have been undercut by the presentation of humanizing evidence concerning Burger's background.

In conclusion, Leaphart's decision not to substantially investigate available mitigating evidence was not a reasonable strategic choice, and thus his failure to investigate constituted ineffective assistance of counsel.

The inquiry does not end with a finding of ineffective assistance. Burger may prevail only if he shows both a denial of effective assistance and actual prejudice to the course of his defense. *Washington v. Strickland,* 693 F.2d at 1258. Under any standard, in this case prejudice is apparent. *See Douglas v. Wainwright,* 714 F.2d 1532 at 1556–58 (11th Cir.1983).

At the federal habeas hearing, Burger offered the testimony of his mother and numerous affidavits concerning his troubled childhood and background. Summarized, this evidence was that Burger's parents had been married when his mother was fourteen and his father was sixteen. His parents divorced when he was a child. Neither parent wanted Burger and his childhood was spent shuffled between the two. His father threw him out of the house; his mother sent him back to live with his father. Burger's mother remarried. Burger's stepfather beat Burger, and beat Burger's mother in his presence; Burger's stepfather involved him in drugs and alcohol when he was eleven years old. Burger's mother and stepfather moved from Indiana to Florida. Burger was sent to live with his father. Burger's father beat him and refused to have anything to do with him. Burger ran away and hitchhiked to Florida to live with his mother, selling his shoes to buy food along the way. When Burger arrived barefoot in Florida his stepfather told him he could not stay with them. Burger's mother told the juvenile authorities that she didn't want him, and to send him back to his father in Indiana. When Burger arrived in Indiana, his father locked him out of the house. Burger was taken in by a neighbor, as he had nowhere else to go. The clinical psychologist who examined Burger testified at a motion hearing that Burger had an I.Q. of 82 and possible brain damage.

It is absolutely astounding to me that none of this evidence was ever presented to Burger's juries. The district court found that although the affidavits of the character witnesses supplied by Burger at the hearing do "contain references to a difficult childhood which might have created some sympathy for Mr. Burger," they also contained references to drug abuse, juvenile probation and violence. However, the thrust of the character testimony offered by Burger was not what Leaphart assumed without investigating, that Burger was a good boy and went to church, but that Burger's personality and motivation could be explained by his stormy and unhappy childhood. Although this is precisely the kind of humanizing evidence that "may make a critical difference, especially in a capital case," Leaphart failed to make a substantial investigation into its use. *Stanley v. Zant,* 697 F.2d at 969. Leaphart testified that "[I] did not have any knowledge of any witnesses that—potential witnesses that I thought would have benefited him. Had I known or had knowledge of any, I would—certainly would have used them." [11] The prejudice to Burger from counsel's failure to substantially investigate available mitigating evidence and present it

---

11. THC at 44.

at either of his capital sentencing proceedings lies in the alternative chosen by counsel: to present no evidence at all. On the basis of the state's case alone, two sentencing juries recommended the death penalty.

Failure to present this substantial, available mitigating evidence meets the prejudice prong of *Washington v. Strickland,* 693 F.2d at 1263–62, showing that "the petitioner suffered actual and substantial detriment to the conduct of his defense."

For these reasons, I would REVERSE the district court's finding that Burger was afforded the effective assistance of counsel during his state court proceedings and REMAND this case to the state court for a trial with Burger being represented by conflict-free and competent counsel.